Alph Grass, Trading as Haberkamp-Grass Machine and Metalizing Works, Appellant, v. Harry Steinberg and Joseph R. Hurwitz, Trading as Cook County Machinery Company, Appellees.

Gen. No. 43,517.

Opinion filed May 20, 1947.   Rehearing denied June 4, 1947.
Released for publication June 9, 1947.

BERNARD F. CUMMINGS, of Park Ridge and THOMAS J. FINNEGAN, of Chicago, for appellant; THOMAS J. FINNEGAN, of Chicago, of counsel.

KAGAN & TUROFF, of Chicago, for appellees; LEE TUROFF and HARRY D. COHEN, both of Chicago, of counsel.

MR. JUSTICE FRIEND delivered the opinion of the court.

In this proceeding plaintiff sought to rescind a contract and recover the sum of $1,000 paid by him on the purchase price of a turret lathe which he had purchased from defendants under a conditional sales contract in December 1943. Defendants filed a counterclaim for recovery of the remainder due under the contract, together with interest and expenses. The cause was originally referred to a master in chancery who resigned from his office during the course of the

hearing, and by order of court he was subsequently appointed a special commissioner. His report to the chancellor recommended dismissal of the complaint and entry of a decree in favor of defendants on their counterclaim. Exceptions by plaintiff and defendants to the report were overruled and a decree entered in accordance with the commissioner's recommendations, from which plaintiff has taken an appeal.

The facts disclose that plaintiff had for many years been engaged in the general machine shop and metalizing business in Chicago. Defendants sold used machinery and other equipment for the general machine shop trade. The following advertisement of a turret lathe appeared in the November and December 1943 issues of the *Surplus Record Magazine,* a periodical devoted to used industrial machinery: ''No. 8 Warner and Swasey, Univ., draw bar & collets.'' Plaintiff's attention having been called to these advertisements, he went to defendants' place of business to inquire about the machine, and was shown the turret lathe here in question, which was on the floor of defendants' premises and which plaintiff subsequently purchased. Plaintiff testified that he talked with Mr. Hurwitz, general manager of defendants' company, and was told that the machine in question was a No. 8 Warner & Swasey Universal machine; that it was in first class condition; and that he had observed it in the process of operation. Evidence disclosed by cross-examination of plaintiff's witnesses reveals that plaintiff is an experienced and skilled machinist with 40 years of experience in this field, and that during the last 26 years he was a designer and builder of special machinery, and as such had more than ordinary skill as a machinist, and that he personally inspected the machine on at least four, and possibly more, separate and distinct occasions before he purchased it. In addition, he also requested William F. Mehl, a mechanical engineer in his employ who had over 30 years of expe-

rience in the engineering profession, during which he had purchased more than 20 lathes for himself and some 40 or 50 others for clients who were setting up machines, to examine the turret lathe in defendants' place of business, at least twice before the purchase. Plaintiff also requested Ernst Zehnder to examine the turret lathe. Zehnder had been a skilled machinist since 1914, and during that period had come in contact with and operated about every type of turret lathe on the market, including a No. 8 Warner & Swasey machine. Still further examination of the machine was made at plaintiff's request by John Rietzke, tool maker and machinist of 45 years of experience. During that period he had worked on all the various types of machine tools, including turret lathes, engine lathes, shapers, millers and planers, and had had charge of a department in which Warner & Swasey lathes had been used. Rietszke examined the machine in question at least once prior to its purchase. At all times when these eight or more separate inspections were made, the machine in question was available for the most rigid examination, and, in fact, the seller assisted in making these examinations convenient even to the extent of having portions of the machine taken apart. There was never any complaint that the machine was neither accessible nor conveniently located for thorough examination.

Following this course of events a conditional sales contract was drawn up and executed by the parties on December 16, 1943, which described the property as "One #8 Warner Swasey Turret Lathe, used, with Barker wrenchless chuck and box of collets, (34). (As inspected by Mr. Grass) Machine as is." The price mentioned in the contract was $2,703, $1,000 payable forthwith and $567.66 on the first day of every month beginning February 1944, until paid. Plaintiff gave defendants his check for $1,000 at the time the contract was signed, and received an invoice from

them covering the transaction, wherein the lathe is referred to as a "#8 Warner Swasey Machine."

The machine was delivered to plaintiff on the day following its purchase. Plaintiff testified that after spending a considerable sum in an attempt to motorize it, he discovered that the machine was not as represented and could not be used by him in his business. Accordingly he contacted the local branch of the Warner & Swasey Company, which sent out its field engineer, John E. Kunze, to examine the machine. Kunze testified that the machine was a "makeshift" proposition containing several "bastard" parts, and that the Warner & Swasey Company had never manufactured anything like it. Within ten days after receiving the machine plaintiff lodged a complaint with Hurwitz, who promised to come over to plaintiff's shop the following day. Defendants denied that any such conversation took place. On January 5, 1944, some 18 days after plaintiff received the lathe, he wrote a letter to the defendants wherein he stated that the machine was not a Warner & Swasey product, as represented, that it contained parts of another manufacture, and that it was of no use to him. He offered to return it to defendants, asked for instructions relative to such return, and requested the money paid on account, plus expenses incurred in connection with the attempt to repair the machine.

In reply to this letter defendants, by their attorneys, on January 7, 1944, advised plaintiff that there was not the slightest basis for the charge of misrepresentation or fraud in connection with the transaction, as the machine was sold in its then condition; that plaintiff had examined it and had purchased it on the basis of the examination; that defendants would make no adjustments of any kind; and that the conditional sales contract called for certain payments which defendants expected plaintiff to make promptly. Following receipt of this letter plaintiff on January 17 instituted these proceedings.

The gravamen of the complaint is that plaintiff undertook to purchase from defendants a certain turret lathe which they had represented and warranted to him as being a ''No. 8 Warner & Swasey turret lathe,'' and that the lathe which he received and which was referred to in the advertisements, invoice and bill of sale covering the transaction, was neither a ''No. 8 Warner & Swasey Universal lathe'' nor a ''No. 8 Warner & Swasey lathe,'' and was of no use or value to him; that upon ascertaining these facts he immediately tendered the machine and asked for the return of the money he had paid; and that these circumstances constituted breach of an implied warranty, arising from the sale of goods by description, and entitled him to a rescission of his contract and the return of money paid on account, plus expenses.

This contention raises the question at the outset whether such a warranty ever came into effect. Under the weight of authority in this and other states, if this was not a sale by description, no implied warranty, such as plaintiff relies upon, ever existed. In view of the inspection and examination of the machine by plaintiff and his experts on numerous occasions before the purchase, we think this transaction cannot be considered as a sale by description; it was simply the sale of a specific ascertained machine in existence and on hand at the time of sale. The parties undoubtedly contracted to buy and sell, respectively, a specific article which was the subject matter of the sale and not some other or different machine standardized only by description. As defendants' counsel argue, a sale by description is similar to one by sample, and the same rules are generally applicable to both such kinds of sale. In either case the goods are not presently on hand or in existence, and therefore they are sold by sample or by description. Accordingly the law provides that there is an implied warranty that the goods, when thereafter supplied, will conform to the sample or description, and it is designed to assure delivery to

the purchaser of that which he agreed to buy, and of necessity applies only to cases where the specific article bought was either not in existence or not on hand at the time and place of the sale. The sample or description sets a standard which the goods delivered are required to meet. However, when the actual goods are on hand so that the parties may see what they are purchasing, there is no necessity for setting such a standard. In the recent case of *People v. Western Picture Frame Co.*, 368 Ill. 336, the court had occasion to pass upon this problem. The question there involved was whether any warranties existed under the contract. Defendant contended that because its officers inspected only a few of the articles there was a sale by sample, and that under sec. 16 of the Uniform Sales Act, Ill. Rev. Stat. 1937, ch. 121½, par. 16 [Jones Ill. Stats. Ann. 121.20], there was ''an implied warranty that the bulk shall correspond with the sample in quality'' and that ''the goods shall be free from any defect rendering them unmerchantable which would not be apparent on reasonable examination of the sample.'' The court held that contention untenable, saying that defendants ''had an opportunity to inspect all the furniture and it has not been shown that the pieces which they saw were not representative or that there was fraudulent concealment of the true condition of the remainder. Under these circumstances, there was no sale by sample within the meaning of the Uniform Sales Act. A clear distinction between sales by sample and sales of the character shown in this case is to be found in *Henry & Co. v. Talcott*, 175 N. Y. 385, 67 N. E. 617. The Court of Appeals of New York in that case said: 'The chief reason for exempting sales by sample from the cardinal rule of *caveat emptor* is that the buyer has no chance to protect himself by an examination of the commodity sold. *When the goods are in the presence of the parties at the time of the sale, and an adequate examination can be made,*

*even if it is inconvenient or difficult, according to the*
*weight of authority the sale is not to be regarded as*
*made by sample, in the absence of an express agree-*
*ment to that effect.  Parties can make their own bar-*
*gains;  . . .  but when nothing is said or written*
*upon the subject, and the buyer has ample opportunity*
*to examine and inspect for himself  . . .  there is*
*no warranty, even if samples are exhibited by the*
*seller, because the parties stand upon an equal foot-*
*ing,' etc.''*  (Italics ours.)  It will thus be seen that
the Supreme Court of this State has followed New
York in holding no implied warranty arises where
goods are presently at hand and inspected, and that
such a transaction does not constitute a sale by sample
or description.  In such instances where the parties
deal at arm's length and on an equal footing, no war-
ranty can be implied, and where the purchaser has an
opportunity to inspect the property and, as in this
case, did inspect it carefully, the rule of *caveat emptor*
may be fairly and equitably invoked.  This rule is in-
dicative of the statutory law in force in this State.
Sec. 15, subpar. 3, Ill. Rev. Stat. 1945, ch. 121½ [Jones
Ill. Stats. Ann. 121.19, subpar. (3)], provides that ''If
the buyer has examined the goods, there is no implied
warranty as regards defects which such examination
ought to have revealed.''  The interpretation of stat-
utes such as this may be found in 55 Corpus Juris 742,
wherein the author says that ''The mere use of de-
scriptive terms in the sale contract is not operative,
however, to bring into existence the warranties aris-
ing from a sale by description, where the sale is not
such as to constitute a sale by description, as where
the subject matter of the sale is determined by inde-
pendent means not connected with the description and
the latter is only incidentally inserted, as for purposes
of identification, or where the transfer of title is di-
rectly conditioned on the delivery of goods answering
the description instead of merely being collaterally

related thereto.'' Numerous decisions in various jurisdictions are cited in support of this statement.

Because of the examination of the machine in question in the case at bar by several experienced machinists and experts, including the plaintiff himself, we think the facts are stronger than those in any of the decisions brought to our attention. Accordingly we have reached the conclusion that the sale was not one by description but of a definite, ascertained and thoroughly examined and inspected article, and therefore no such implied warranty existed as would justify rescission.

Plaintiff earnestly argues that the machine which he purchased was not a No. 8 Warner & Swasey Universal turret lathe, as advertised, because although it feeds crosswise by power, the longitudinal feed is by hand. The special commissioner dealt with this subject at considerable length. Several of plaintiff's witnesses admitted that a Universal turret lathe is one which feeds both crosswise and longitudinally, and the special commissioner found that regardless of the fact that the machine in question feeds crosswise by power but longitudinally only by hand, it is nevertheless a Universal turret lathe, as shown by the 1907 catalogue of Warner & Swasey ''which listed the identical machine as a No. 8 Turret screw machine and showed that it had automatic cross feed and hand longitudinal feed.'' He further found ''that the 1912 catalogue also listed as No. 8 turret screw machine and that neither in the 1907 or 1912 catalogues was the machine specifically listed as 'universal,' but that the 1907 model showed that it was a longitudinal hand feed and the 1912 catalogue had a longitudinal power feed and that this was the only essential difference between the two machines.'' From these circumstances the commissioner concluded that both the 1907 and 1912 catalogues described a '' 'universal' carriage and that a universal carriage is one which feeds both crosswise

and longitudinally as was testified to by a number of witnesses in this case."

The conclusion to be deducted from the testimony of the witnesses is that a universal lathe is one which has a feed in two directions: to the right and to the left, along the bed, called the longitudinal feed; and forward and backward at right angles to the bed, called the cross feed. The witness upon whom plaintiff principally relies, Mr. Kunze, the Warner & Swasey representative who had been in the company's employ for nearly 50 years, testified that the universal feature of the No. 8 Warner & Swasey lathe was that it would "feed any way, cross, forward and back, longitudinal, forward and back," and that the Warner & Swasey Company did not ever manufacture a No. 8 Warner & Swasey lathe which was not known as a universal turret lathe. It thus appears that the Warner & Swasey Company itself regarded every No. 8 lathe it manufactured as a universal. Mr. Kunze was then shown by defendants a 1907 catalogue issued by Warner & Swasey Company describing the 1907 model of the Warner & Swasey machine, and the following question was put to him: "Is that a universal carriage portrayed on that machine?" Mr. Kunze replied: "This is a universal carriage, yes, sir." Later, on redirect examination the following took place: "Mr. Cummings [plaintiff's counsel]: I am asking at this time, Mr. Kunze, whether or not Defendants' Exhibit 1 and Defendants' Exhibit 2 [portraying, respectively, the 1907 and 1912 models of the No. 8 Warner & Swasey lathes] are both universal lathes? A. Absolutely."

From a consideration of the evidence it is fair to conclude that every No. 8 Warner & Swasey machine manufactured was known as a universal machine and that the turret lathe in question was identical with the 1907 Warner & Swasey lathe shown in the catalogue. We therefore think that the special commis-

sioner properly concluded that the machine in question was a universal lathe with a carriage moving both longitudinally and crosswise, and that the determination of its universality is not based upon whether such movement is by hand or power but by the universality or direction of its movement.

Aside from these considerations we revert to the examinations which plaintiff made and caused to be made of the machine which he subsequently purchased, by men who were undoubtedly experts in their field. It is difficult to believe that their examination did not disclose the fact that this particular lathe had a longitudinal feed by hand. The controls on the lathe governing the movement of the carriage must have been plainly visible on inspection. The machine in question has two wheels, one governing the hand cross feed and one governing the hand longitudinal feed, and one lever by which the power cross feed is controlled. The evidence discloses that in machines which also feed longitudinally under power there exists another lever for the purpose of controlling the power longitudinal feed, but on the machine in question this last lever did not exist. As counsel for defendants state, a turret lathe may be a mysterious thing to a lawyer, special commissioner or judge, but it is a basic tool in common use among machinists, and it is inconceivable that men of such experience did not know, after careful examination, what they were getting. All the characteristics of this lathe were visible at a glance and were subject to ascertainment. They were neither latent nor concealed, and must have been known and understood at the time of the purchase.

In addition to the foregoing considerations, defendants' counsel argue that under the Uniform Sales Act (Ill. Rev. Stat. 1945, ch. 121½ [Jones Ill. Stats. Ann. 121.05 *et seq.*]) no warranty can exist unless the purchaser relies upon the warranty. Section 12 provides that ''Any affirmation of fact or any

promise by the seller relating to the goods is an express warranty if the natural tendency of such affirmation or promise is to induce the buyer to purchase the goods, and if the buyer purchases the goods relying thereon.'' The fact is evident in this proceeding that in buying the machine plaintiff relied upon nothing except the many inspections which he and his experts made, and therefore there could be no warranty of any kind, either express or implied.

The decree dismissed the complaint for want of equity, and as to the counterclaim the decree provided that plaintiff be allowed to retain the machine upon paying to defendants the amount due under the conditional sales contract, plus interest and all costs, and in the event plaintiff does not make such payments within 30 days from the date of the decree, that the machine be sold at public auction under the direction of the court, and from the proceeds thereof, after payment of the costs of sale, that the defendants and their attorneys be paid the amounts due them, and in the event of a deficiency, that the defendants have judgment and execution thereon.

Finding as we do that the sale in question was not a sale by description but of a specific article in existence and thoroughly and repeatedly inspected by plaintiff and his experts, who were all well qualified to make such an inspection, and that plaintiff did not rely upon any warranty but only upon his examination of the property purchased, we hold that there could be no such warranty, either express or implied, as to justify a rescission. Accordingly, the decree of the circuit court should be affirmed, and it is so ordered.

*Decree affirmed.*

SULLIVAN, P. J., and SCANLAN, J., concur.