(No. 61614.—

JOHN L. SZAJNA, Appellant, v. GENERAL MOTORS
CORPORATION, Appellee.

*Opinion filed December 19, 1986.—Rehearing
denied January 30, 1987.*

John F. O'Meara, of Chicago, and Richard J. Friedman, of Highland Park (Leoris & Cohen, of Highland Park, of counsel), for appellant.

William R. Jentes, Garrett B. Johnson, Robert J. Kopecky, Michael P. Foradas and J. Andrew Langan, of

Kirkland & Ellis, of Chicago (Louis H. Lindeman, Jr., of Detroit, Michigan, of counsel), for appellee.

JUSTICE RYAN delivered the opinion of the court:

The plaintiff, John L. Szajna (Szajna), filed a suit in the circuit court of Cook County against the defendant, General Motors Corporation (GM), on his own behalf and on behalf of all others who bought 1976 Pontiac Venturas which were equipped with Chevette transmissions. Szajna sought damages based solely on economic loss alleged to have resulted from receipt of the "inferior" Chevette transmission. Count I of his second amended complaint is based on an alleged breach of implied warranty under section 2—314 of the Uniform Commercial Code (UCC) (Ill. Rev. Stat. 1975, ch. 26, par. 2—314) and section 110(d) of title I of the Magnuson-Moss Warranty—Federal Trade Commission Improvement Act (Magnuson-Moss) (15 U.S.C. sec. 2310(d) (1976)). Count II is based on an alleged breach of express warranty under section 2—313 of the UCC (Ill. Rev. Stat. 1975, ch. 26, par. 2—313). Count III alleges common law fraud. The trial court granted GM's motion to strike and dismiss the second amended complaint. Szajna elected to stand on his complaint and filed a motion to reconsider. The trial court denied the motion to reconsider and dismissed the second amended complaint with prejudice. The court did not determine whether the suit could be maintained as a class action. The appellate court affirmed. (130 Ill. App. 3d 173.) We granted Szajna's petition for leave to appeal (94 Ill. 2d R. 315).

In reviewing the appellate court's affirmance of the trial court's decision to grant GM's motion to strike and dismiss Szajna's second amended complaint, we must accept as true all well-pleaded facts and all inferences which can be reasonably drawn from those facts. *Browder v. Hanley Dawson Cadillac Co.* (1978), 62 Ill. App.

3d 623, 629.

The following allegations were common to all three counts of Szajna's second amended complaint. In August 1976, he bought a 1976 Pontiac Ventura from Seltzer Pontiac, Inc. (Seltzer), in Chicago. Seltzer, as agent for GM, gave Szajna a folder which contained two warranties: one entitled a "Limited Warranty On 1976 Pontiac Car" and another entitled "1976 Pontiac Passenger Car Emission Control System." It was alleged that both warranties were made by GM to Szajna. It was also alleged that thousands of the cars sold as 1976 Pontiac Venturas, including Szajna's, were equipped with Chevette transmissions; that the use of Chevette transmissions in Pontiac Venturas necessitates higher amounts of repairs and that they have shorter service lives than do transmissions ordinarily used in Pontiac Venturas because the Chevette transmission was designed for use in a lighter weight car; that use of the Chevette transmission in Pontiac Venturas lessens the value of the cars; and that Szajna paid $375 to have the transmission in his car replaced.

The following allegations were also common to all three counts. GM manufactured, labeled and made available through its Pontiac Division the 1976 Pontiac Ventura. GM designed and engineered a transmission specifically for the 1976 Pontiac Ventura. "Through its brochures, parts catalogues and repair manuals, as well as through the release of automobile news and information from its public relations department," GM "advised the expert observers, testers and reporters of the nature of the '1976 Pontiac Ventura' model as including the transmission designed for that size of car." The public and Szajna, in buying the cars, relied on the experts and on GM for any noteworthy information on GM cars not readily observable. No information was given to the public or the experts that some of the 1976 Pontiac Ven-

turas were equipped with Chevette transmissions.

Count I of Szajna's second amended complaint alleges breach of implied warranty under section 2—314 of the UCC. It alleges that 1976 Pontiac Venturas equipped with Chevette transmissions were not merchantable because they "would not pass without objection in the trade" under the contract description; "were not of fair average quality within the description, did not run within the variations permitted by the agreement of even kind and quality and did not conform to their labels" as Pontiac Venturas. (See Ill. Rev. Stat. 1975, ch. 26, pars. 2—314(2)(a), (b), (d), (f).) (The "description" referred to above was the name 1976 Pontiac Ventura.) Count I also alleges that the failure by GM to deliver 1976 Pontiac Venturas as warranted rendered them nonconforming goods for which Szajna and other purchasers could revoke acceptance (Ill. Rev. Stat. 1975, ch. 26, par. 2—608) or receive damages (Ill. Rev. Stat. 1975, ch. 26, par. 2—714).

Szajna also alleges in count I breach of implied warranty pursuant to section 110(d) of Magnuson-Moss, which provides that a consumer who is damaged by the failure of a supplier or warrantor to comply with any obligation under an implied warranty may bring suit for damages and other legal and equitable relief in any court of competent jurisdiction in any State. 15 U.S.C. sec. 2310(d)(1) (1976).

In dismissing count I of Szajna's second amended complaint, the trial court entered the following conclusions of law. First, privity of contract is a prerequisite in Illinois to a suit for breach of implied warranty alleging economic loss. Second, Magnuson-Moss, in permitting recovery for breach of implied warranty, incorporates State-law privity requirements. (15 U.S.C. sec. 2301(7) (1976).) Third, no privity of contract existed between Szajna and GM. Fourth, the limited written warranty ex-

tended by GM, although running to the ultimate purchaser, did not give rise to the implied warranty of merchantability. The appellate court, in essence, adopted the trial court's conclusions of law. It was of the opinion, however, that while Szajna and GM "were in privity for purposes of the provisions in the express limited warranty, they were not in privity for purposes of implied warranties, which were specifically disclaimed by the express warranty." *Szajna v. General Motors Corp.* (1985), 130 Ill. App. 3d 173, 177.

Szajna urges this court to abolish the privity requirement in suits for breach of an implied warranty when a plaintiff seeks to recover for economic loss. In *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612, this court held that lack of privity of contract was no longer a defense in a tort action against the manufacturer in a products liability case. In *Suvada* this court abandoned the concept of implied warranty in tort and followed the holding of the California court in *Greenman v. Yuba Power Products, Inc.* (1962), 59 Cal. 2d 57, 377 P.2d 897, 27 Cal. Rptr. 697, and the position taken in Restatement (Second) of Torts section 402A (1965). This court imposed liability on the theory of strict liability in tort. Later, in *Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548, this court considered an implied warranty of the fitness of a product for a particular purpose under section 2—315 of the UCC (Ill. Rev. Stat. 1965, ch. 26, par. 2—315). After considering the language of section 2—318 of the UCC and this court's prior decisions, it held that privity is of no consequence when a buyer who has sustained personal injury predicates recovery against a remote manufacturer on the theory of implied warranty. (*Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548, 558.) Although *Berry* involved recovery under the UCC, the action was one for personal injury, not economic loss.

We need not trace in detail the development of the re-

treat from the strict privity requirement as it relates to implied warranty and the theories upon which recovery, in the absence of privity, has been allowed. That has been the subject of numerous articles. Its discussion further here would be needless repetition. Dean Prosser appears to have spearheaded the attack on implied-warranty privity in two oft-cited articles. (Prosser, *The Assault Upon the Citadel (Strict Liability to the Consumer)*, 69 Yale L.J. 1099 (1960) (hereafter referred to as *Assault*); Prosser, *The Fall of the Citadel (Strict Liability to the Consumer*), 50 Minn. L. Rev. 791 (1966) (hereafter referred to as *Fall*).) Although Prosser favored abolition of the privity requirement and indeed the concept of implied warranty in a broad area, he nonetheless favored the contractual nature of implied warranty and its privity requirement when recovery for economic loss was sought. (See *Fall*, 50 Minn. L. Rev. 791, 820-23 (1960).) Much more has been written on the historical development of this subject. See Edmeades, *The Citadel Stands: The Recovery of Economic Loss in American Products Liability*, 27 Case W. Res. 647 (1977); Special Project, *Article Two Warranties in Commercial Transactions*, 64 Cornell L. Rev. 30, 67-68, 263-65 (1978); Note, *Economic Losses and Strict Products Liability: A Record of Judicial Confusion Between Contract and Tort*, 54 Notre Dame Law. 118 (1978); see also *Privity of Contract as Essential in Action Against Remote Manufacturer or Distributor for Defects in Goods not Causing Injury to Person or to Other Property*, Annot., 16 A.L.R.3d 683 (1967); J. White & R. Summers, Uniform Commercial Code sec. 11—2, at 399-401 (2d ed. 1980); 3 R. Anderson, Uniform Commercial Code secs. 2—314:92 through 2—314:100, at 199-207 (3d ed. 1983).

The law, as it applies to recovery for purely economic loss, is far from clear and most certainly is not uniform in all the jurisdictions. Many States have abandoned the

privity-of-contract requirement but have done so on different theories. In *Santor v. A & M Karagheusian, Inc.* (1965), 44 N.J. 52, 207 A.2d 305, the Supreme Court of New Jersey permitted recovery for economic loss in the absence of privity of contract on the theory of strict liability in tort. This rationale has been followed in a small minority of States. (See Razook, *The Ultimate Purchaser's and Remote Seller's Guide Through the Code Defenses in Product Economic Loss Cases*, 23 Bus. L.J. 85, 87 n.16 (1985) (hereafter referred to as *Razook*).) One author has been quite critical of the judicial extension of strict liability in tort. (See Shanker, *A Case Of Judicial Chutzpah (The Judicial Adoption of Strict Tort Products Liability Theory)*, 11 Akron L. Rev. 697 (1978).) The theory of strict tort liability in economic cases was rejected by the California Supreme Court in *Seely v. White Motor Co.* (1965), 63 Cal. 2d 9, 403 P.2d 145, 45 Cal. Rptr. 17, where the court declined to follow *Santor*. In *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, this court traced the development of products liability law in regard to economic loss and declined to follow *Santor* and the line of cases which imposed liability for economic loss on the theory of strict liability. This court, instead, adopted the rationale of *Seely* and held that recovery for economic loss should be had within the framework of contract law rather than tort law.

In *Professional Lens Plan, Inc. v. Polaris Leasing Corp.* (1984), 234 Kan. 742, 675 P.2d 887, the Kansas Supreme Court traced the development of products liability law in that State and noted that privity requirements had not been applied in areas where public policy so dictated. In such cases implied warranty arose not by virtue of a contractual relationship but because public policy required the imposition of the obligations of implied warranties. Thus, since implied warranties in such

cases are not contractual, there is no privity require-
ment. (See also Rasor, *The History of Warranties of
Quality in the Sale of Goods: Contract or Tort?—A Case
Study in Full Circles*, 21 Washburn L.J. 175 (1982).) In
*Picker X-Ray Corp. v. General Motors Corp.* (D.C.
1962), 185 A.2d 919, the court recognized that courts
generally have begun to disassociate contract from im-
plied warranty and that the implied warranty is in fact a
duty imposed by law for the protection of the public.
Thus, privity is of no consequence.

It appears that much of the confusion involving priv-
ity as it relates to implied warranty stems from the im-
precise use of the term implied warranty. That term, un-
fortunately and inaccurately, has been used to describe
obligations imposed by law as a matter of public policy
totally unrelated to any contractual relationship. It has
also been used to describe obligations implied because of
a privity relationship between contracting parties. We
need not develop this distinction further at this time or
discuss its many ramifications. We leave that to the legal
scholars and commentators. Suffice it to say that in this
State we have, for public policy reasons, abolished the
requirement of privity in certain noneconomic-loss areas.
(See *Suvada v. White Motor Co.* (1965), 32 Ill. 2d 612;
*Berry v. G. D. Searle & Co.* (1974), 56 Ill. 2d 548.) How-
ever, as noted above in *Moorman*, we held that recovery
for economic loss must be had within the framework of
contract law. *Moorman Manufacturing Co. v. National
Tank Co.* (1982), 91 Ill. 2d 69, 86.

In *Moorman* this court quoted at length from Justice
Traynor's opinion in *Seely*, which explained that the dis-
tinction between the two standards of recovery is not ar-
bitrary but rests on an understanding of the nature of
the responsibility a manufacturer must undertake in dis-
tributing his product:

" 'He can appropriately be held liable for physical injuries caused by defects by requiring his goods to match a standard of safety defined in terms of conditions that create unreasonable risks of harm. He cannot be held for the level of performance of his products in the consumer's business unless he agrees that the product was designed to meet the consumer's demands. A consumer should not be charged at the will of the manufacturer with bearing the risk of physical injury when he buys a product on the market. He can, however, be fairly charged with the risk that the product will not match his economic expectations unless the manufacturer agrees that it will. ***' [*Seely v. White Motor Co.* (1965),] 63 Cal. 2d 9, 18, 403 P.2d 145, 151, 45 Cal. Rptr. 17, 23." *Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 80-81.

In *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, this court held that for public policy reasons an implied warranty of habitability was created between the builder-vendor of a new house and his vendee. In that case, by virtue of the direct contractual relationship, privity existed between the parties. In *Redarowicz v. Ohlendorf* (1982), 92 Ill. 2d 171, a majority of this court, again for public policy reasons, created a limited extension of the implied warranty of habitability to a subsequent purchaser not in privity with the builder-vendor.

Relying on *Redarowicz*, Szajna now urges this court to extend the same right to the purchasers of new automobiles who are not in privity with the manufacturer, arguing that the same reason for extending the implied warranty in *Redarowicz* exists in cases involving purchasers of new cars. It may be that certain similarities with regard to inability to discover defects exists in both situations. However, the same compelling need for the remedy against the manufacturer of new cars is not present. In the sale of a home the transaction usually in-

volves an individual owner who sells to an individual buyer. In such cases there ordinarily would be no implied warranty as to latent defects. (See *Petersen v. Hubschman Construction Co.* (1979), 76 Ill. 2d 31, 37-41.) Since the UCC applies to "transactions in goods" (Ill. Rev. Stat. 1975, ch. 26, par. 2—102), no implied warranty of merchantability (section 2—314) or fitness for a particular purpose (section 2—315) would be created by the UCC. Thus the need for the public policy pronouncements of *Petersen* and *Redarowicz.*

By way of contrast, in the purchase of a new car the transaction in most instances involves a responsible commercial entity (the dealer) and an individual. The sections of the UCC referred to above create implied warranties running from the dealer to the purchaser. The purchaser of a defective product is not left without a remedy and in most instances is not left without a responsible entity from which the purchaser can recover. It is argued that if a dealer is not financially responsible, the purchaser has no remedy. There is nothing before us that indicates that that is the situation in this case. Also, there is no showing that this condition occurs other than infrequently. We see no compelling need to extend *Redarowicz.*

As noted earlier, a number of States have judicially abolished the privity requirement in economic-loss cases for various reasons. (See Comment, *Enforcing the Rights of Remote Sellers Under the UCC: Warranty Disclaimers, The Implied Warranty of Fitness for a Particular Purpose and the Notice Requirement in the Nonprivity Context,* 47 U. Pitt. L. Rev. 873, 887-88 (1986) (hereafter referred to as *Rights of Remote Sellers*).) Some States have legislatively abolished the privity requirement. (See 3 R. Anderson, Uniform Commercial Code sec. 2—314:98 (1985 Supp.).) We need not here consider whether privity or nonprivity jurisdictions are in

the majority. Professors White and Summers assert that the majority of courts, absent proof of reliance by the nonprivity buyer upon representations by the remote seller, hold that privity is a requirement in cases seeking recovery for economic loss. (J. White & R. Summers, Uniform Commercial Code sec. 11—5, at 407 (2d ed. 1980).) Szajna, in his brief, argues to the contrary.

We must keep in mind that the law recognizes two kinds of privity which have been designated by the writers on the subject as horizontal and vertical. Horizontal privity is not, in reality, a state of privity but rather one of nonprivity. The term refers to those who are not in the distributive chain of a product but who, nonetheless, use the product and retain a relationship with the purchaser, such as a member of the purchaser's family. Vertical privity refers to the relationship between those who are in the distributive chain. We are concerned here with vertical privity. The UCC does not directly address vertical privity. Section 2—318 of the UCC provides:

> "A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of the warranty. A seller may not exclude or limit the operation of this Section." (Ill. Rev. Stat. 1975, ch. 26, par. 2—318.)

This section was adopted in this State in 1961. It is identical to the original provisions of section 2—318 of the Uniform Commercial Code, and is now referred to as alternative A. 1A Unif. Laws Ann. 52-53 (1976).

The UCC comment says that this section is not intended to enlarge or restrict developing case law on whether the seller's warranties to his buyer who resells extend to other persons in the distributive chain. Ill. Ann. Stat., ch. 26, par. 2—318, Uniform Commercial

Code Comment, at 265 (Smith-Hurd 1963).

In 1966 the UCC added alternative B, which extends the seller's warranty to *any person* who may reasonably be expected to use the goods and who *is injured in person* by a breach of the warranty. Thus, alternative B broadens the class of those to whom the seller's warranties apply from those listed in alternative A. Also added in 1966 was alternative C, which is the same as alternative B except the warranties extend to *any person* who may reasonably be expected to use the goods and *who is injured* by the breach of the warranty. Thus, alternative C does not require that the user be injured in person. Neither alternative B nor C has been adopted in Illinois. Therefore, in Illinois section 2—318 extends the warranty of the seller only to those who are *injured in person* by a breach of the warranty and is concerned only with horizontal privity. Alternative B and alternative C, which have not been adopted in Illinois, arguably can be said to apply to both horizontal- and vertical-privity cases. In fact, one author contends that alternative C completely eliminates any vertical-privity requirement. See *Rights of Remote Sellers*, 47 U. Pitts. L. Rev. 873, 886-87 (1986).

The UCC comment on alternative A referred to above professes neutrality insofar as vertical privity and developing case law in that area are concerned. However, the remainder of the UCC speaks in terms of contractual relationship. One author who favors eliminating the vertical-privity requirement acknowledges that the "seller-buyer" terminology in the UCC sections on warranty (sections 2—313, 2—314 and 2—315) possibly indicates a strict privity requirement but contends that this is offset by the comment expressing UCC neutrality on the vertical-privity issue. (*Razook*, 23 Bus. L.J. 85, 92-93 (1985).) It should be pointed out, however, that the UCC comment referred to does not express the *UCC's* neu-

trality on that issue. The comment states only that the *section* (2—318) is neutral on the vertical-privity issue. (Ill. Ann. Stat., ch. 26, par. 2—318, Uniform Commercial Code Comment, at 265 (Smith-Hurd 1963).) The professed neutrality of this section should not be viewed as an invitation to the courts to abolish the privity requirement but should be considered as an acknowledgment by the drafters that the law of implied warranty had developed along nonprivity lines in certain jurisdictions and could possibly further develop in that direction before the UCC was adopted in the various States, and that such developing law should not be viewed as contrary to section 2—318. Nor should it be viewed as a prohibition against further development in that direction.

Although section 2—318 may be neutral on the vertical-privity issue, the remainder of the UCC clearly recognizes "the consensual elements of commerce." (*State ex rel. Western Seed Production Corp. v. Campbell* (1968), 250 Or. 262, 267, 442 P.2d 215, 217.) The Kansas Supreme Court, commenting on the contractual nature of the provisions of the UCC, stated: "An across-the-board extension of implied warranties to non-privity manufacturers or sellers, without regard to the nature of either the involved product or the type of damage sought, would spawn numerous problems in the operation of Article 2 of the Uniform Commercial Code." *Professional Lens Plan, Inc. v. Polaris Leasing Corp.* (1984), 234 Kan. 742, 755, 675 P.2d 887, 898.

Aside from the above reason for adhering to the privity requirement of implied warranty in economic-loss cases, we have previously stated in *Moorman* our preference for applying contract law in such cases. We stated: "[A]pplication of the rules of warranty prevents a manufacturer from being held liable for damages of unknown and unlimited scope." (*Moorman Manufacturing Co. v. National Tank Co.* (1982), 91 Ill. 2d 69, 79.) We further

stated: "We believe it is preferable to relegate the consumer to the comprehensive scheme of remedies fashioned by the UCC, rather than requiring the consuming public to pay more for their products so that the manufacturer can insure against the possibility that some of his products will not meet the business needs of some of his customers." (91 Ill. 2d 69, 79-80.) These reasons are based on the same concerns that have been voiced about the result of allowing recovery by nonprivity plaintiffs. See J. White & R. Summers, Uniform Commercial Code sec. 11—6, at 409-10 (2d ed. 1980); *Rights of Remote Sellers*, 47 U. of Pitt. L. Rev. 873, 896 (1986).

In speaking of economic loss the commentators and cases have divided the subject into direct economic loss and consequential economic loss. For purposes of understanding the distinction, we may simply state that direct economic loss involves the loss of bargain by reason of the product being defective. Consequential economic loss may be said to involve expectations such as loss of profits, etc. It has been noted that "[e]ven courts that allow non-privity consumer purchasers to recover for direct economic loss do not permit such purchasers to recover for consequential economic loss." (J. White & R. Summers, Uniform Commercial Code sec. 11—6, at 409 (2d ed. 1980).) Such a distinction involves pure judicial legislation. There is nothing in the implied-warranty sections of the UCC (section 2—314 (implied warranty of merchantability) and section 2—315 (implied warranty of fitness)) which extends the warranty to a buyer (privity or nonprivity) if he seeks direct economic loss but not if he seeks consequential economic loss. Of course, many economic-loss cases involve situations where a purchaser may suffer both direct and consequential losses and may claim both in the same case. It would seem incongruous to hold that the UCC extended an implied warranty to the purchaser which would permit him to recover for the

direct loss but not the consequential. Such an artificial distinction may well inject needless additional confusion into the law on this subject. The line of demarcation between nonprivity and privity is best left at the point defined in *Moorman* between economic loss and noneconomic loss.

We think it is unnecessary to indulge in the judicial legislation just referred to and the further judicial legislation necessary to reconcile nonprivity to the UCC requirements, particularly of notice (section 2—607(3)(a)), requiring *buyer* to notify *seller*, and disclaimers and limitations (sections 2—316 and 2—719), both of which are stated in contractual language. Even those who favor the abolition of privity recognize that some judicial adjustments of the UCC must be made to accommodate nonprivity implied warranties. (See *Razook*, 23 Bus. L.J. 85, 100-05 (notice), 111 (disclaimers and limitations of liability).) We view judicial intervention unnecessary in view of the legislative concern expressed by certain enactments in this field which we will discuss later. We therefore decline to abolish the privity requirement in implied-warranty economic-loss cases.

Both the Illinois General Assembly and Congress have enacted legislation for the protection of consumers and designed to augment the protection afforded by the UCC. Our General Assembly has enacted the New-Car Buyer Protection Act (Act) (Ill. Rev. Stat. 1985, ch. 121½, par. 1201 *et seq.*, commonly referred to as the Illinois lemon law). (See generally Basanta, *The Illinois New Car Buyer Protection Act—An Analysis and Evaluation of the Illinois Lemon Law*, 1984 S. Ill. U. L.J. 1 (1984).) This law does not affect the transaction involved in this case because it applies only to motor vehicles beginning with the model year following the effective date of the Act, January 1, 1984. Also, the subject matter of that act is not as broad as the issues in our case. How-

ever, the Act indicates that the General Assembly is mindful and concerned about the problems facing the consumer purchaser of automobiles. Section 2L of the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1985, ch. 121½, par. 262L) is further indicative of legislative activity in this area. These acts are designed to give further protection to the consumer beyond that afforded by the UCC and the Federal Magnuson-Moss Act discussed later and to remedy perceived deficiencies in relief available for defects in consumer products. For a discussion concerning the depth of legislative interests in this area, see Coffinberger & Samuels, *Legislative Responses to the Plight of New Car Purchasers*, 18 U.C.C. L.J. 168 (1985). Thus there exists a legislative concern with and a pattern of remedies created by the legislature for defective consumer products with which there is no compelling reason to judicially interfere. See *Flory v. Silvercrest Industries, Inc.* (1981), 129 Ariz. 574, 580, 633 P.2d 383, 389; *State ex rel. Western Seed Production Corp. v. Campbell* (1968), 250 Or. 262, 267, 442 P.2d 215, 217.

Magnuson-Moss, enacted by Congress in 1975, is not limited in its application to the sale of automobiles but applies to consumer products in general. It does not require that warranty be given, but if there is a *written* warranty, Magnuson-Moss imposes certain requirements as to its contents, disclosures, and the effect of extending a written warranty. Such warranties under Magnuson-Moss must be designated as either a "full" warranty (one that meets the Federal minimum standards set forth in section 2304 of Magnuson-Moss) (15 U.S.C. sec. 2304 (1976)) or a "limited" warranty (one that does not meet the minimum standards). A warrantor giving a "full" written warranty may not impose any limitations on the duration of an implied warranty and may not exclude or limit consequential damages for breach of a

written or implied warranty. (15 U.S.C. sec. 2304 (1976).) No supplier may disclaim or modify an implied warranty, except a supplier giving a limited written warranty may limit the duration of an implied warranty to the duration of the written warranty if such limitation is conscionable and is clearly set forth (15 U.S.C. sec. 2308 (1976).) For purposes of this case we need not discuss in detail the nature of Magnuson-Moss or the effect of its various sections. For discussions of Magnuson-Moss and its interaction with the UCC, see Eddy, *Effects of the Magnuson-Moss Act Upon Consumer Product Warranties*, 55 N.C. L. Rev. 835 (1977); Schroeder, *Private Actions Under the Magnuson-Moss Warranty Act*, 66 Calif. L. Rev. 1 (1978); Miller & Kanter, *Litigation Under Magnuson-Moss: New Opportunities in Private Actions*, 13 U.C.C. L.J. 10 (1980); Sanson, *The Automobile Warranty Crisis: Would Enactment of Proposed Amendments to the Magnuson-Moss Warranty Act Provide a Panacea for the Consumer?* 85 Dick. L. Rev. 407 (1981); Lester, *The Magnuson-Moss Warranty Act: The Courts Begin to Talk*, 16 U.C.C. L.J. 119 (1983); Note, *Consumer Product Warranties Under the Magnuson-Moss Warranty Act and the Uniform Commercial Code*, 62 Cornell L. Rev. 738 (1977). In this case we are concerned only with the question of whether, under Magnuson-Moss, Szajna can maintain an action based on an implied warranty against the manufacturer of the automobile. Magnuson-Moss suffers from certain deficiencies insofar as clarity is concerned. (See *Skelton v. General Motors Corp.* (N.D. 1980), 500 F. Supp. 1181, 1184, *rev'd in part on other grounds* (7th Cir. 1981), 660 F.2d 311.) The provisions of Magnuson-Moss relating to implied warranties are no exception to this observation. Section 2301(7) defines implied warranty as follows:

"The term 'implied warranty' means an implied warranty arising under State law (as modified by sections

2308 and 2304(a) of this title) in connection with the sale by a supplier of a consumer product." (15 U.S.C. sec. 2301(7) (1976).)

Focusing on that part of the definition stating the term means "an implied warranty arising under State law," some authors maintain that if the law of the State holds that privity is essential to implied warranty, then an action such as is involved in our case cannot be maintained. (Miller & Kanter, *Litigation Under Magnuson-Moss: New Opportunities in Private Actions*, 13 U.C.C. L.J. 10, 22 (1980).) However, the definition also states that the term means an implied warranty arising under State law "(*as modified by sections 2308 and 2304(a) of this title*)." (Emphasis added.) (15 U.S.C. sec. 2301(7) (1976).) Section 2308 provides:

"No supplier may disclaim or modify (except as provided in subsection (b) of this section [limiting the duration of an implied warranty to the duration of a 'limited' written warranty]) any implied warranty to a consumer *** if (1) such supplier makes any written warranty to the consumer *** or (2) at the time of sale, or within 90 days thereafter, such supplier enters into a service contract with the consumer which applies to such consumer product." (15 U.S.C. sec. 2308(a) (1976).)

This section raises the question as to whether it modifies implied-warranty State-law provisions to the extent that any written warranty given by a manufacturer to a remote purchaser creates an implied warranty by virtue of Magnuson-Moss. At the very least we must acknowledge that the provisions of section 2308 clearly demonstrate the policy of Magnuson-Moss to sustain the protection afforded to consumers by implied warranties.

The Act broadly defines "consumer" in section 2301(3) as "a buyer (other than for purposes of resale) of any consumer product, any person to whom such product is transferred during the duration of an implied or

written warranty *** and any other person who is entitled by the terms of such warranty *** or under applicable State law to enforce against the warrantor *** the obligations of the warranty." (15 U.S.C. sec. 2301(3) (1976).) It has been suggested that this broad definition of "consumer" and the provisions of section 2310(d)(1) (15 U.S.C. sec. 2310(d)(1) (1976)), which section authorizes a "consumer" to maintain a civil action for damages for failure of a "supplier" or "warrantor" to comply with any obligation of a written or implied warranty, effectively abolish vertical privity. (See Comment, *Consumer Product Warranties Under the Magnuson-Moss Warranty Act and the Uniform Commercial Code*, 62 Cornell L. Rev. 738, 755-59 (1977).) We do not think we can focus on any one section of Magnuson-Moss but should read the sections referred to together to accomplish the purpose of Magnuson-Moss of furnishing broad protection to the consumer.

In resolving this murky situation we find helpful, and accept, Professor Schroeder's analysis and suggestion as a reasonable solution. In cases where no Magnuson-Moss written warranty has been given, Magnuson-Moss has no effect upon State-law privity requirements because, by virtue of section 2301(7), which defines implied warranty, implied warranty arises only if it does so under State law. However, if a Magnuson-Moss written warranty (either "full" or "limited") is given by reason of the policy against disclaimers of implied warranty expressed in Magnuson-Moss and the provisions authorizing a consumer to sue a warrantor, the nonprivity "consumer" should be permitted to maintain an action on an implied warranty against the "warrantor." (Schroeder, *Privity Actions Under the Magnuson-Moss Warranty Act*, 66 Calif. L. Rev. 1, 16 (1978).) The rationale of this conclusion, though not specifically articulated by Professor Schroeder in the article, would hold that under Magnu-

son-Moss a warrantor, by extending a written warranty to the consumer, establishes privity between the warrantor and the consumer which, though limited in nature, is sufficient to support an implied warranty under sections 2—314 and 2—315 of the UCC. The implied warranty thus recognized, by virtue of the definition in section 2301(7) of Magnuson-Moss, must be one arising under the law of this State. In support of our holding see generally, M. Rigg & R. Alpert, Sales of Goods and Services sec. 26.9.3, at 122 (1985 Cum. Supp.); *Ford Motor Co. v. Lee* (1976), 137 Ga. App. 486, 224 S.E.2d 168, *rev'd in part on other grounds* (1976), 237 Ga. 554, 229 S.E.2d 379; *Beck v. Spindler* (1959), 256 Minn. 543, 99 N.W.2d 670; *Volkswagen of America, Inc. v. Novak* (Miss. 1982), 418 So. 2d 801; *Ventura v. Ford Motor Corp.* (App. Div. 1981), 180 N.J. Super. 45, 433 A.2d 801.

The appellate court in this case held that while the parties were in privity for purposes of the provisions of the express written limited warranty which General Motors had extended, they were not in privity for the purposes of implied warranty. (130 Ill. App. 3d 173, 177.) This holding is in conflict with our holding herein and will therefore be reversed. The appellate court, in the same sentence, stated that implied warranties were "specifically disclaimed by the expressed warranty." (130 Ill. App. 3d 173, 177.) The written warranty in this case limited any implied warranties to the duration of the written warranty. Thus, the part of the warranty referred to by the appellate court as disclaiming implied warranties may properly be referred to as a limitation on the duration of an implied warranty. Such limitation is covered by sections 2304(a)(2) and 2308(b) of Magnuson-Moss. We will not here define how this disclaimer-limitation fits within the contours of section 2—316 of the UCC, which covers "exclusions or modifications of warranties." Szajna here contends that the issue of dis-

claimer was not raised, briefed or argued by GM in either the circuit or appellate courts and should not have been considered by the appellate court. These issues, it is argued, are affirmative defenses which, because of other provisions of the UCC and Magnuson-Moss, may or may not be applicable to this transaction. GM also has stated that it does not believe the disclaimer-limitation issue can be resolved fully on the basis of the allegations of Szajna's complaint and therefore did not address these questions in its briefs. In light of this, we find that the trial court erred in dismissing count I, and this cause will be remanded to the circuit court of Cook County. So that the trial court will know whether count II and count III remain viable parts of the complaint, we must further consider the propriety of the appellate court's holding that these counts were properly dismissed.

Count II of Szajna's second amended complaint alleges breach of express warranty pursuant to section 2—313 of the UCC. In addition to the allegations mentioned above that were common to all three counts, several others pertained specifically to count II. It was alleged that GM, in labeling and advertising 1976 Pontiac Venturas, made an affirmation of fact and a description of the goods which became part of the basis of the bargain. (Ill. Rev. Stat. 1975, ch. 26, pars. 2—313(1)(a), (1)(b).) Also, that in labeling and advertising 1976 Pontiac Venturas, GM warranted that the nature of the material and equipment used was of the kind and quality that could be expected from cars which had the transmissions designed and engineered for use in that car. Finally, it alleged that Szajna and the general public, in purchasing cars, relied on the description of a car by division and model, which meant to them that the component parts of the car were of the kind and quality which GM publicized were part of the car.

The trial court held that, as a matter of law, Szajna

had failed to allege the existence of an express warranty by GM that his car would be equipped with a particular transmission. Likewise, the appellate court stated that it did "not believe that defendant's use of a trade name, alone, [could] be extended to encompass a 'description' of the transmission used." 130 Ill. App. 3d 173, 178.

Szajna does not maintain that GM breached the terms of its limited written warranty. Nor does he claim to have seen any express representation by GM pertaining to the transmission used in 1976 Pontiac Venturas or to have relied on any such representation. Rather, count II is based on the contention that the name "1976 Pontiac Ventura" is a description which, under section 2—313 of the UCC (Ill. Rev. Stat. 1975, ch. 26, par. 2—313), constitutes an express warranty of kind and quality as to the car and its component parts. While Szajna has cited several Illinois cases in support of this contention (*Fuchs & Lang Manufacturing Co. v. R. J. Kittredge & Co.* (1909), 242 Ill. 88; *Overland Bond & Investment Corp. v. Howard* (1972), 9 Ill. App. 3d 348; *Appleman v. Fabert Motors, Inc.* (1961), 30 Ill. App. 2d 424; *Grass v. Steinberg* (1947), 331 Ill. App. 378), none of those cases stand for the proposition that a trade name is a description creating an express warranty that the product is of a particular quality or that its component parts are of a particular kind or quality. Szajna has also cited *Kilborn v. Henderson* (1953), 37 Ala. App. 173, 65 So. 2d 533, and *Klein v. Asgrow Seed Co.* (1966), 246 Cal. App. 2d 87, 54 Cal. Rptr. 609. However, we agree with the appellate court that those cases are distinguishable. In both cases it was the misdescription of a product which was held to constitute a breach of an express warranty that the product would conform to the description.

The name "1976 Pontiac Ventura" includes characteristics of both a trademark and a trade name. (See Ill. Rev. Stat. 1983, ch. 140, pars. 8(a), (f).) It identifies the

manufacturer. It identifies and distinguishes the car (product) from cars produced by other manufacturers. It also serves to identify and distinguish the car from other car models made by GM and from cars of the same model made by GM in other years. However, it does not, alone, describe the transmission used in the car or its quality. In the context of new cars, there is and must be a distinction between a manufacturer's description of its product and a manufacturer's warranty of its product. See *Denna v. Chrysler Corp.* (1964), 1 Ohio App. 2d 582, 206 N.E.2d 221; see also *Coca-Cola Co. v. Koke Co. of America* (1920), 254 U.S. 143, 65 L. Ed. 189, 41 S. Ct. 113 (the name Coca-Cola was commonly understood to describe the beverage (product) rather than its ingredients (components)).

· Although a trademark or trade name has traditionally been viewed as identifying the origin or source of the goods to which it is affixed, in recent years trademarks and trade names have assumed another function, that of assuring the purchaser of a certain degree of uniformity or quality. (Hanak, *The Quality Assurance Function of Trademarks*, 43 Fordham L. Rev. 363, 375 (1974).) However, this assurance of uniformity of quality does not preclude all changes in the product. In the article last cited, the author states that purchasers of new automobiles, while unable to discern mechanical changes from prior models, fully expect changes to exist and that variations necessitated by trade discoveries, newer and more economical methods of making the same product, or changed manufacturing conditions are not contrary to the assurance-of-uniformity or quality role of the trademark. (Hanak, *The Quality Assurance Function of Trademarks*, 43 Fordham L. Rev. 363, 375 (1974); see also Comment, *Traffic in Trade-Symbols*, 44 Harv. L. Rev. 1210, 1216 (1931).) We hold that the name "1976 Pontiac Ventura," alone does not create an express war-

ranty of the kind or nature of the car's components.

Counts I and II of the second amended complaint were based on the theory of a contract (count I, implied warranty; count II, express warranty).

Count III of the second amended complaint is in tort and alleges common law fraud. It included the allegations mentioned above that were common to all three counts. It also alleged that the description of the 1976 Pontiac Ventura as containing a transmission designed for it as "inferred in the advertising" of GM was a material fact; that the description was in material part untrue; that GM made the representation knowing it to be untrue; and that GM made the representation to induce Szajna and the public to buy the car. The trial court held that, as a matter of law, Szajna had failed to allege any misstatement of material fact by GM giving rise to an action for fraud. The appellate court agreed, stating that a "trademark or brand name, alone, is [not] intended to include a representation that the component parts of [a] product are of a particular kind or quality." 130 Ill. App. 3d 173, 179.

Again, Szajna does not claim to have relied on any specific assertion by GM pertaining to the transmission used in the 1976 Pontiac Ventura. Rather, count III is based on the contention that the name 1976 Pontiac Ventura is a representation of material fact as to the kind and quality of the car and its component parts. However, the cases cited by Szajna in support of this contention are distinguishable in that, as the appellate court indicated, they involved specific representations of material fact about the vehicles in question which were found to be untrue and therefore actionable.

*Alver v. Broadway Buick Sales Co.* (1958), 18 Ill. App. 2d 542 (abstract of decision), involved the misrepresentation of a "1955 Ford Mainliner" as a "1956 Ford Fairlane." In *Ballard v. Byerly* (1924), 233 Ill. App. 522,

the defendant specifically represented that the car he sold to the plaintiff was a "1923 Model" Essex which had been but little used in demonstrating, while in fact it was a greatly used "1922 Model." *Preiser v. Jim Letts Oldsmobile, Inc.* (1981), 160 Ga. App. 658, 288 S.E.2d 219, simply held that material issues of fact had been created by the evidence as to whether a car dealer and manufacturer had fraudulently concealed the fact that an Oldsmobile contained a Chevrolet engine, thus precluding summary judgment. Although the case speaks of summary judgment, it also refers to conflicts in the evidence on the question of fraud which created questions of fact. In *Riggs v. Peach State Ford Truck Sales, Inc.* (N.D. Ga. 1980), 503 F. Supp. 190, the plaintiff bought a truck which was fraudulently represented to be a factory made "1975 Peterbilt," but was instead a kit truck. In *Gour v. Daray Motor Co., Inc.* (La. App. 1979), 373 So. 2d 571, the purchaser of an Oldsmobile was entitled to an annulment of the sale where the car was equipped with a Chevrolet engine. The plaintiff alleged that he was unaware of the substitution of engines. He described himself as an "Oldsmobile man" and alleged he would not have purchased the car had he known of the Chevrolet engine. The air cleaner on the engine had a red and black on silver decal which read "Oldsmobile 350." The salesman for the dealer testified that he told the plaintiff that the engine in the Oldsmobile was a Chevrolet engine. The plaintiff denied having heard that statement. The trial court found that the knowledge of the source of the engine had not been effectively communicated to the plaintiff. The court of review stated that it believed it should be presumed from the circumstances of the case that the seller knew that the plaintiff's desire to obtain an Oldsmobile with an Oldsmobile engine was the principal cause for his entering into the contract of sale. The court affirmed the holding of the trial court

that, under the facts of the case, the sale was invalid. In *Parker v. Green* (Mo. App. 1960), 340 S.W.2d 435, the defendant fraudulently represented to the plaintiff that the car he bought was a 1953 Packard "Series 400," when in fact it was a "Series 300." Finally, in *State v. General Motors Corp.* (Sup. Ct. New York County 1983), 120 Misc. 2d 371, 466 N.Y.S.2d 124, it was held that under the laws of New York a complaint filed by the Attorney General which alleged that GM knew that a transmission it had installed in various car models would fail prematurely stated a cause of action. The action was brought under section 63(12) of the Executive Law, which had been construed to not only incorporate the common law definition of fraud, but also to expand that definition to create a new standard of liability. The court held that under the definitions contained in the statute, a cause of action had been stated. Because of the different statutory language, the case is not in point.

Essential to the cause of action for deceit is an intent to deceive, to mislead, to convey a false impression. (*Soules v. General Motors Corp.* (1980), 79 Ill. 2d 282, 286; W. Prosser, Torts sec. 107, at 700 (4th ed. 1971).) This court has held that the concept of fraud implies a wrongful intent, an act calculated to deceive. *Exline v. Weldon* (1974), 57 Ill. 2d 105, 110; *Zeve v. Levy* (1967), 37 Ill. 2d 404, 409; *Dahlke v. Hawthorne, Lane & Co.* (1966), 36 Ill. 2d 241, 245. See also *First National Bank v. Insurance Co. of North America* (7th Cir. 1970), 424 F.2d 312, 318; *Paskas v. Illini Federal Savings & Loan Association* (1982), 109 Ill. App. 3d 24, 32; *Cokinis v. Maywood-Proviso State Bank* (1980), 81 Ill. App. 3d 1057, 1063.

Fraud is never presumed, but it may be inferred from the nature of the acts complained of. (*Majewski v. Gallina* (1959), 17 Ill. 2d 92, 99.) The intent to deceive can be found from the fact that a person makes a statement

knowing it to be false when the statement is made for the purpose of inducing the one to whom the statement is made to act. Also, it is generally held that the intent to deceive is present when the statement is made without any belief that it is true or with a reckless disregard as to whether it is true or false. W. Prosser, Torts sec. 107, at 701 (4th ed. 1971).

In our case there are no allegations that GM made the assertion to Szajna or to the public in general that 1976 Pontiac Venturas were all equipped with a transmission that had been specifically designed for that automobile. Szajna alleges that it is "inferred" in the "advertising" that the 1976 Ventura had the transmission designed for it. Thus, Szajna bases his cause of action on an inference of an untrue statement by GM from which inference we are, in turn, asked to infer the necessary fraudulent intent to deceive. We have held above that the use of the trade name "Pontiac Ventura" does not create an express warranty of the quality and nature of the vehicle's components. We likewise now hold that the use of this name as the description of the vehicle does not constitute an untrue statement capable of supplying an inference of intent to deceive. We hold that the allegations of count III do not state a cause of action based on fraud.

We point out that in count III there are no allegations of a cause of action based on fraudulent concealment, which was one of the grounds alleged in *Preiser v. Jim Letts Oldsmobile, Inc.* (1981), 160 Ga. App. 658, 661, 288 S.E.2d 219, 222. See W. Prosser, Torts sec. 106, at 695 (4th ed. 1971); Keeton, *Fraud-Concealment And Non-Disclosure*, 15 Tex. L. Rev. 1 (1936).

GM contends that Szajna did not meet the notice requirements of section 2—607 of the UCC (Ill. Rev. Stat. 1975, ch. 26, par. 607(3)(a)), as that requirement relates to the implied warranty and express warranty. This case

is before us on the pleadings, and this issue is therefore not involved.

For the foregoing reasons, the judgment of the appellate court, affirming the dismissal of Szajna's second amended complaint is reversed as to count I and the cause is remanded to the circuit court of Cook County. The appellate court's judgment affirming the dismissal of counts II and III of the second amended complaint is affirmed. The judgment of the circuit court with respect to count I is reversed. Its judgment with respect to counts II and III is affirmed.

*Appellate court affirmed in part and reversed in part; circuit court affirmed in part and reversed in part; cause remanded.*