# CIRCUIT COURT OF THE CITY OF SUFFOLK

Archie R. Stoney
and Nancy S. Stoney

v.

John A. Franklin,
Franklin Construction Co., Inc.,
Dryvit Systems, Inc.,
MW Manufacturers, Inc.,
Lowe's Home Centers, Inc.,
Thomasville Millwork Division

June 18, 2001

Case No. (Law) CL00-387

BY JUDGE D. ARTHUR KELSEY

The plaintiffs, Archie and Nancy Stoney, hired a contractor to build a house for them. Claiming that the contractor used defective building materials, the plaintiffs seek to impose liability on the manufacturers and assemblers of these building materials on negligence, constructive fraud, and implied warranty grounds. For the following reasons, the Court sustains the defendants' demurrers to the negligence and constructive fraud claims and overrules the demurrers to the implied warranty claims.

The Motion for Judgment asserts that the plaintiffs entered into a construction contract with John Franklin and Franklin Construction Co. to

build a residence at 104 Riverside Drive in Suffolk, Virginia, on property already owned by the plaintiffs. *See* Motion for Judgment ¶ 1. The builder completed the home and delivered it to the plaintiffs in December 1996. *Id.* ¶ 2. At "some point" thereafter, the plaintiffs "began noticing water intrusion at various points within the house, which is clad in an exterior insulation finish system (EIFS)." *Id.* ¶ 3. According to the plaintiffs' inspector, the water entered the house through the EIFS and windows. *Id.* ¶ 5-6.

The plaintiffs allege that John Franklin and Franklin Construction Co. breached the construction contract by failing to apply adequate caulking around windows and doors, installing defective EIFS and windows, and installing a defective roofing system. *Id.* ¶ 10. These contractual breaches, the plaintiffs claim, caused them $150,000 in damages due to the cost of repairing damaged portions of the house and installing a new exterior siding for the structure. To the contractual count against the Franklin defendants, the plaintiffs add claims of negligence, constructive fraud, and breach of express warranty. *See* Motion for Judgment, Counts I to X (¶¶ 1-45).

The plaintiffs also assert claims against Dryvit Systems, Inc. (the manufacturer of the EIFS) for breach of implied warranty of merchantability (Count IX), breach of implied warranty of fitness for a particular purpose (Count X), negligence (Count XI), fraud (Count XII), negligent misrepresentation (Count XIII), and constructive fraud (Count XIV). The plaintiffs assert similar claims against MW Manufacturing, Inc. (the manufacturer of the window sashes) and Lowe's Home Centers, Inc., Thomasville Millwork Division (the manufacturer and assembler of the window frames). *See* Motion for Judgment, Counts XV to XVIII.

The plaintiffs take particular aim at Dryvit, the manufacturer of the EIFS product, claiming Dryvit knew of the inadequacies of its product for many years. The plaintiffs rely on a 1984 "Inter-Departmental" memo addressing EIFS problems. In that memo, a Dryvit official stated to a colleague in the company:

> I find appalling the position taken by the group that the public's safety should be compromised as part of a business risk decision. Specifically, it was agreed that failures of the subject applications are inevitable and are a normal part of the risk assumed in the use of construction products. I beg to differ. Products which are inherently sensitive to failure due to normal in-use conditions such as water leakage, should not be used in applications where such deterioration could lead to failures which would jeopardize the public's safety. Specifically, this relates to the subject applications on many projects,

particularly tall buildings, without the use of mechanical fasteners. . . .
I fear that the inevitable leakage which will deteriorate the sheathing
will soon be upon us in terms of the life cycle of this product and its
caulking joints soon being reached on the older projects.

Plaintiffs' Response to *Craving Oyer* Motion, Exhibit A (Memo from L. Douglas Mauit to Robert G. Thomas, Jr.). The plaintiffs allege the internal debate at Dryvit festered into the 1990s, as evidenced by this "Inter-Departmental" memo by another Dryvit official:

> If Engineering Services is correct, can the EIFS industry survive and grow if job after job starts failing say five years from now? More importantly, could Dryvit survive?
>
> If we continue on this road, 1 hope Dryvit structures a new and heavily beefed-up accrual fund based on each and every Direct Applied project we do. The fact that these position papers have been written suggests if future failures occur on a substantial percentage of completed jobs, we could be required to pay triple and punitive damages because of unfair and deceptive practices.
>
> Are we playing the same game as Morton-Thiokol, the producer of the O-Rings for the Space Shuttle?

Plaintiffs' Response to *Craving Oyer* Motion, Exhibit B (Dryvit Memo from Duncan Crowther to Doug Doscher).

Dryvit has filed a demurrer challenging all claims against it. MW and Lowe's have filed similar demurrers relying on the arguments advanced by Dryvit. In this Opinion and Order, the Court will address only the defendants' objections to the plaintiffs' negligence, constructive fraud, and implied warranty claims against Dryvit, MW, and Lowe's.

Under settled principles, a demurrer "tests the legal sufficiency of a pleading and can be sustained if the pleading, considered in the light most favorable to the plaintiff, fails to state a valid cause of action." *Welding, Inc. v. Bland County Service Auth.*, 261 Va. 218, 226, 541 S.E.2d 909, 913 (2001) (citation omitted). The trial court should "consider as admitted the facts expressly alleged and those which fairly can be viewed as impliedly alleged or reasonably inferred from the facts alleged." *Id.* The court, however, should not presume the "correctness of the pleading's conclusions of law." *Yuzefovsky v. St. John's Wood Apartments*, 261 Va. 97, 102, 540 S.E.2d 134, 137 (2001); *Thompson v. Skate America, Inc.*, 261 Va. 121, 128, 540 S.E.2d 123, 128 (2001).

Ordinarily, the trial court looks only to factual allegations found in the motion for judgment. In this case, however, the defendants filed a motion to *crave oyer* requesting that the plaintiffs produce and incorporate all documents referred to (or, in some cases, merely alluded to) in the motion for judgment. The plaintiffs agreed to produce these documents, and thus, they will be treated as exhibits to the motion for judgment.[1] *See Ward's Equip., Inc. v. New Holland North America, Inc.*, 254 Va. 379, 382, 493 S.E.2d 516, 518 (1997) (documents produced in response to *craving oyer* motion may be taken into account by a court ruling on a demurrer). "These documents are properly considered in determining whether a valid cause of action has been pleaded." *Welding, Inc.*, 261 Va. at 227, n. 3, 541 S.E.2d at 914, n. 3 (2001); *Flippo v. F & L Land Co.*, 241 Va. 15, 17, 400 S.E.2d 156, 156 (1991).

The plaintiffs' negligence claims against Dryvit, MW, and Lowe's assert that these suppliers negligently designed, manufactured, or assembled the building materials that allegedly failed. Under Virginia law, these allegations do not state a viable cause of action. The common law does not recognize a negligence claim for purely economic damages against one not in contractual privity with the claimant. Courts draw the line between mere economic losses (noncompensable in tort) and damage to property (compensable in tort) based on the underlying policy objectives distinguishing tort law from contract law. *See generally Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.*, 152 F.3d 313, 316 (4th Cir. 1998); *Redman v. John D. Brush & Co.*, 111 F.3d 1174 (4th Cir. 1997); *Ward v. Ernst & Young*, 246 Va. 317, 325-26, 435 S.E.2d 628, 632 (1993); *Copenhaver v. Rogers*, 238 Va. 361, 366, 384 S.E.2d 593, 595 (1989).

Economic losses "for which no action in tort will lie" typically involve a buyer's "disappointed economic expectations." *Sensenbrenner v. Rust, Orling & Neale*, 236 Va. 419, 422-26, 374 S.E.2d 55, 56-58 (1988); *see also Gerald M. Moore & Son v. Drewry*, 251 Va. 277, 279, 467 S.E.2d 811, 813 (1996); *Blake Const. Co. v. Alley*, 233 Va. 31, 353 S.E.2d 724 (1987). In this context, the duty breached involves one arising only out of contractual relationships which "necessitates an analysis of the damages which were within the contemplation of the parties when framing their agreement." *Sensenbrenner*, 236 Va. at 425, 374 S.E.2d at 58. Damage to property, on the other hand,

---

[1] The plaintiffs' consent to the *craving oyer* order waives any objection to the arguably overbroad nature of the defendants' motion. *See* John L. Costello, *Virginia Remedies* § 7-9(g), at 226 (2d ed. 1999) (*craving oyer* motions, to the extent they have any continued viability after the abolition of the *profert*, should be limited to "those cases where the cause of action depended on a unique instrument, such as a deed, bond or letters of probate.").

implicates tort duties when the underlying concern seeks to protect the "safety of persons and property" from injury, quite apart from any concern over the preservation of contractual expectancies. *Sensenbrenner*, 236 Va. at 425, 374 S.E.2d at 58. Though somewhat formless, this distinction ensures that contract law not "drown in a sea of tort" as a result of the "more or less inevitable efforts of lawyers to turn every breach of contract into a tort." *Id.* (quoting *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858, 866 (1986), and *Kamlar Corp. v. Haley*, 224 Va. 699, 706, 299 S.E.2d 514, 517 (1983)).

In this case, the plaintiffs allege nothing more than disappointed economic expectations. They entered into a contract for the construction of a residence. The agreement required the builder to "construct a house" in accordance with the contractual terms and design plans. Contract for Construction ¶ 1 (Exhibit A to Motion for Judgment). The builder warranted that "any defects due to faulty materials or workmanship" would be corrected by the builder if reported within a certain period of time. *Id.* ¶ 10. All of the damages claimed by the plaintiffs in their motion for judgment involve defects allegedly due to faulty materials or workmanship. The remote manufacturers of the EIFS and window components supplied materials to the builder pursuant to purchase orders, entirely consensual transactions for which one would expect the law of contracts to be the exclusive umpire. As in *Sensenbrenner*, the plaintiffs claim the contractual "package" was defective because:

> one or more of its component parts was sufficiently substandard as to cause damage to other parts. The effect of the failure of the substandard parts to meet the bargained-for level of quality was to cause a diminution in the value of the whole, measured by the cost of repair. This is a purely economic loss, for which the law of contracts provides the sole remedy.

*Sensenbrenner*, 236 Va. at 425, 374 S.E.2d at 58; *see also Directors of the Bay Point Condominium Ass'n, Inc. v. RML Corp.*, 52 Va. Cir. 432, 436 (Norfolk 2000) (holding in *Sensenbrenner* "squarely on point" in EIFS case). For these reasons, the Court sustains the demurrers to Counts XI, XV, and XVII asserting negligence claims against Dryvit, MW, and Lowe's, as well as Count XIII alleging negligent misrepresentation.[2]

---

[2] The economic loss rule applies to claims of negligent misrepresentation. *See Ritter v. Custom Chemicides, Inc.*, 912 S.W.2d 128, 132, n. 5 (Tenn. 1995) (Widespread agreement exists on the proposition that "a plaintiff may not use the tort of negligent misrepresentation to recover pure economic loss resulting from a product's failure to perform as expected."); *see, e.g.*, William L. Prosser & W. Page

The same conclusion also applies to the plaintiffs' allegations in Count XIV seeking a recovery for constructive fraud. "The essence of constructive fraud is negligent misrepresentation." *Richmond Metropolitan Auth. v. McDevitt Street Bovis, Inc.*, 256 Va. 553, 559, 507 S.E.2d 344, 347 (1998). It does not impose any state-of-mind requirement like that necessary for a showing of actual fraud. The culpability range begins with a false representation "innocently" made and goes no higher than one "negligently" made. *Economopoulos v. Kolaitis*, 259 Va. 806, 813, 528 S.E.2d 714, 719 (2000) (quoting *Henderson v. Henderson*, 255 Va. 122, 126, 495 S.E.2d 496, 499 (1998)).

Constructive fraud never involves any conduct more egregious than mere negligence. Nor does constructive fraud implicate any public policy issues more serious than those arising out of negligent design and manufacture claims. The economic loss rule, therefore, applies to constructive fraud allegations no less than it does to negligence claims. As U.S. District Judge Kiser has explained:

> Constructive fraud is effectively nothing more than a claim of negligence. Carried to its logical conclusion it would emasculate the economic loss rule. Constructive fraud implies no greater duty for a defendant to be accurate in its representations than does a negligence standard. Thus the fraud exception to the economic loss rule is solely for actual fraud, a distinction correctly made in the decisions cited *supra*, and one adhered to here.

*Virginia Transformer Corp. v. P. D. George Co.*, 932 F. Supp. 156, 163 (W.D. Va. 1996); *see also Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill. 2d 69, 61 Ill. Dec. 746, 435 N.E.2d 443 (1982) (cited approvingly in *Sensenbrenner*, 236 Va. at 423, 374 S.E.2d at 57). On this ground, the Court dismisses Count XIV as a matter of law.

The plaintiffs also assert claims against Dryvit, MW, and Lowe's under the Uniform Commercial Code. Counts IX, X, XVI, and XVIII contend that these defendants violated UCC implied warranties of merchantability and fitness for a particular purpose both in their design and manufacture of their

---

Keeton, *The Law of Torts* § 101, at 708 (5th ed. 1988). Moreover, to the extent that Count XIII asserts a cause of action distinct from (and in addition to) the constructive fraud asserted in Count XIV, the Court holds that no such cause of action exists under Virginia law. *See Haigh v. Matsushita Elec. Corp.*, 676 F. Supp. 1332, 1349-50 (E.D. Va. 1987); *Directors of Bay Point Condo. Ass'n, Inc. v. RML Corp.*, 52 Va. Cir. 432, 443 (Norfolk 2000).

respective building supplies. Each of these claims fail, the defendants argue, because (i) the economic loss rule bars any implied warranty claims just as effectively as it bars negligent design and manufacture causes of action, and (ii) in any event, the UCC does not apply because the contract to build the residence involved a services contract (rather than a sale of goods) and, to make matters worse, the residence constitutes an immovable fixture of realty outside the reach of the UCC.

On the first point, the defendants contend that the economic loss rule cuts off implied warranty claims for the same reason it acts as a bar to the plaintiffs' negligence claims. No Virginia case directly addresses this issue. The Fourth Circuit certified this issue to the Virginia Supreme Court in *Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.*, 152 F.3d 313, 319 (4th Cir. 1998), with the commentary that "it would be odd if economic losses, which result from the frustration of bargained-for expectations, could not be recovered for breach of warranty, notwithstanding the lack of privity, given the especially broad reach of Virginia's § 8.2-318."

In reply to the certified question in *Beard*, the Virginia Supreme Court conspicuously avoided any discussion of the reach of the economic loss rule into implied warranty law. Instead, the Virginia Supreme Court confined its analysis to the statutory privity requirement implicit in the UCC's definition of consequential damages. *Beard Plumbing & Heating, Inc. v. Thompson Plastics, Inc.*, 254 Va. 240, 244-45, 491 S.E.2d 731, 733 (1997) (interpreting Va. Code Ann. § 8.2-715(2)(a) (Michie 1991)). This privity requirement, the Virginia Supreme Court noted, stems entirely from the UCC and was "not a privity requirement imposed by the common law." *Id.* The observation that the common law would *not* impose a privity requirement in implied warranty claims seeking consequential economic losses undermines the existence of a common law privity requirement generally applicable to all economic loss claims (even those asserting direct damages) in implied warranty cases. In any event, the specific holding in *Beard* neither endorses nor forbids the application of the economic loss rule to implied warranty claims seeking direct damages. *See Directors of Bay Point Condo. Ass'n, Inc. v. RML Corp.*, 52 Va. Cir. 432, 439 (Norfolk 2000) (*Beard* "expressly limited its discussion to breach of warranty claims for consequential economic loss damages, stating, 'we assume that the Court of Appeals concluded that the economic loss damages claimed by Beard were consequential damages rather than direct damages'.").

The debate draws us back to first principles. The economic loss rule exists, in large part, to guard "one of the last hilltops on the boundary between tort and contract." John L. Costello, *Virginia Remedies* § 21-5(f), at 862 (2d

*ed.* 1999). Tort law involves public policy concerns over safety, both to persons and property, that carry with them the non-consensual imposition of duties. A manufacturer may choose to build a product and sell it. But whether the manufacturer agrees to or not, he must use reasonable care or be held responsible if his product injures either persons or property. Tort law imposes duties upon the otherwise unwilling. That is, no consent-of-the-governed concepts apply to tortfeasors. On the other hand, contract law involves an entirely different set of principles. Contract law itself imposes few, if any, duties in the first instance. As a general rule, contractual duties stem only from the consensual dealings of the parties. Based upon the expressed (or, in the case of implied warranties, the presumed) intention of the parties, contract law merely recognizes — rather than imposes — legal duties and permits the parties wide latitude to limit their liability and to disclaim implied warranties when the protected interests are purely economic.

Framed this way, the question is whether UCC implied warranty claims should be characterized as a sub-species of tort or contract for purposes of the economic loss rule. The best answer to this question comes from *East River S.S. Corp. v. Transamerica Delaval*, 476 U.S. 858 (1986), a unanimous U.S. Supreme Court decision relied upon by the Virginia Supreme Court in *Sensenbrenner*. In distinguishing tort law concepts from those with a contractual pedigree, *East River S.S. Corp.* pointed out that disappointed customer expectations about product value "is precisely the purpose of express and implied warranties." *Id.*, 476 U.S. at 877-78 (citing UCC § 2-313 (express warranty), § 2-314 (implied warranty of merchantability), and § 2-315 (warranty of fitness for a particular purpose)). "Contract law, and the *law of warranty in particular*, is well suited to commercial controversies of the sort involved in this case because the parties may set the terms of their own agreements." *Id.* at 878 (emphasis added). Unlike most tort duties, a "manufacturer can restrict its liability, within limits, by disclaiming warranties or limiting remedies." *Id.*

These characteristics sufficiently distinguish UCC implied warranty claims from pure tort claims — when the remedy sought is purely economic — making it both unnecessary and unwise to treat them alike. *See generally Redman*, 111 F.3d at 1182 ("Virginia law permits a manufacturer to tailor both the warranty protection offered with a product and the remedies available for breach of warranty. *See* Va. Code §§ 8.2-316, 8.2-719. As a result, the extent of liability and the remedies available in a warranty action are often quite different from the remedies available in tort. By precluding recovery of economic losses in actions for tort, the economic loss rule preserves the balance of rights and remedies established by warranty law."). The economic

loss rule barring negligence claims, therefore, does not apply to the plaintiffs' claims for breach of implied warranty of merchantability and fitness for a particular purpose.

The defendants also argue that, as a matter of statutory construction (rather than the application of the common law economic loss rule), no buyer of goods can ever seek direct damages from an upstream supplier. *See* Dryvit Brief in Support of Demurrer at 5, n. 1 (April 4, 2001). That result cannot be reconciled with the breadth of Virginia's anti-privity statute. The UCC offered three versions of anti-privity statutes to accompany Article 2's warranty provisions. Virginia adopted a paraphrase of Alternative C, the most expansive version. Under Va. Code Ann. § 8.2-318 (Michie 1991), lack of privity cannot be asserted as a bar to "*any action* brought against the manufacturer or seller of goods to *recover damages* for breach of warranty, express or implied, or for negligence, although the plaintiff did not purchase the goods from the defendant, if the plaintiff was a person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods. . . ." (emphasis added). A claim for direct damages fits within the scope of "any action" to "recover damages" for breach of an implied warranty.

Unlike the built-in privity requirement of consequential damages, *Beard Plumbing & Heating, Inc.*, 254 Va. at 244-45, 491 S.E.2d at 733, no similar privity requirement can be interpolated into the statutory definition of direct damages. *See Directors of Bay Point Condo. Ass'n, Inc.*, 52 Va. Cir. at 440 ("As opposed to the statute governing consequential damages considered by the Court in *Beard*, the UCC's provision governing the measure of direct damages in a breach of warranty claim does not condition the award of damages on the existence of a contract."). Indeed, if one were in fact found by the courts, the legislature's inclusion of implied warranties in the anti-privity statute would be essentially repealed by the judiciary.

Those jurisdictions that have retained a privity requirement for direct economic losses do not have the broad anti-privity statute adopted in Virginia. The Illinois Supreme Court, for example, held that privity must be established given its limited anti-privity statute (Alternative A), *Szajna v. General Motors Corp.*, 115 Ill. 2d 294, 303, 503 N.E.2d 760, 762 (1986), but acknowledged that the broadest version of the anti-privity statute (Alternative C) arguably "eliminates any vertical-privity requirement." *Id.*, 115 Ill. 2d at 308 (citing Comment, *Enforcing the Rights of Remote Sellers Under the UCC: Warranty Disclaimers, The Implied Warranty of Fitness for a Particular Purpose and the Notice Requirement in the Nonprivity Context*, 47 U. Pitts. L. Rev. 873, 886-87 (1986)); *see generally* William L. Stallworth, *An Analysis of Warranty*

*Claims Instituted by Non-Privity Plaintiffs in Jurisdictions That Have Adopted Uniform Commercial Code Section 2-318 (Alternatives B & C)*, 27 Akron L. Rev. 197, 203 (1993) (Non-privity plaintiffs "who have sustained only property damage or economic loss may have standing to sue under Alternative C."). The Virginia anti-privity statute, therefore, defeats the defendants' argument that direct economic damages can never be recovered in the absence of privity.

Even so, the defendants also contest the application of any UCC theory of recovery against them. The UCC, they correctly point out, applies only to transactions involving the "sale of goods." Va. Code Ann. § 8.2-106(1) (Michie 1991); *see also* Va. Code Ann. § 8.2-102 (Michie 1991) ("this title applies to transactions in goods"). If a contract involves both goods and services, it qualifies as a UCC contract only if its "predominant thrust" is the purchase of goods "with labor incidentally involved." *Palmetto Linen Service v. U.N.X., Inc.*, 205 F.3d 126, 129 (4th Cir. 2000). According to the Fourth Circuit, the seminal case applying this standard explains:

> The test for inclusion or exclusion is not whether they are mixed but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom).

*Princess Cruises, Inc. v. General Elec. Co.*, 143 F.3d 828, 833 (4th Cir. 1998) (quoting *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir. 1974)).

In this case, the plaintiffs contracted for the construction of a house. As the defendants correctly contend, the plaintiffs did not purchase stocks of two-by-fours, roof trestles, electrical conduit, window units, and plywood floor boards with the ancillary benefit of having these materials fashioned into a residential building. The contract called for a turn-key delivery of the house after a walk-through inspection. *See* Contract for Construction ¶ 5 (Exhibit A to Motion for Judgment). Nothing in the allegations of the motion for judgment or its exhibits suggests the plaintiffs contracted for specific personal property outside the scope of the "Contract for Construction." It is for this reason that "[m]ost courts find construction contracts to be primarily for services." 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 9-2, at 482 (4th ed. 1995); *see generally DeMatteo v. White*, 233 Pa. Super. 339, 336 A.2d 355 (1975) (construction of residence from start to finish not a sales transaction within UCC).

For similar reasons, the defendants assert that the UCC also does not apply to sales of immovable improvements to real estate. The term "goods" includes things "which are movable at the time of identification to the contract for sale" and can include fixtures to realty if they are intended "to be severed from realty." Va. Code Ann. § 8.2-105(1) (Michie 1991). The building supplies complained about in the motion for judgment were all incorporated into the residential building. They did not *at that time* involve movable goods, or for that matter, identifiable goods intended later to be severed from the realty. The building itself constitutes an improvement to realty, a fixture qualifying for the status of real property every bit as much as the land itself.

This analysis is certainly right, as far as it goes — but it only goes so far. It proves that the UCC does not apply to the sale of the residence because it constitutes both a services contract and a sale of an improvement to realty. And, for that reason, the plaintiffs cannot sue the builder for breach of any UCC implied warranties. In this case, however, no such claim has been asserted. Instead, the plaintiffs seek to enforce the implied warranties made by the manufacturers and assemblers of the building products. Those transactions clearly involved sales of goods, not contracts for services or real estate. Under Va. Code Ann. § 8.2-105(1), goods exist if they "are movable at the time of identification to the contract of sale." In context, the "contract of sale" identifying the goods refers to the sale involving the seller that made the implied warranty — not simply the party with whom the claimant contracted.

Unless disclaimed, implied warranties accompanying goods extend under Virginia's anti-privity statute to any "person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods." Va. Code Ann. § 8.2-318. *See generally Steingaszner v. Paramount Termite Control Co.*, 5 Va. Cir. 309 (Alexandria 1985) (party in privity with a services provider may nonetheless sue remote suppliers under implied warranty law).[3]

---

[3] No implied warranty claim can be successful if the manufacturer's goods are "substantially changed after the time of sale." *Bly v. Otis Elevator Co.*, 713 F.2d 1040, n. 2 (4th Cir. 1983). Dryvit argues that its EIFS product "lost all of its distinctive characteristics" once "incorporated into plaintiffs' dwelling." Dryvit Reply Brief in Support of Demurrer at 5 (June 15, 2001). Dryvit manufactured EIFS, however, for the very purpose of being applied to the exterior of buildings. It makes no sense to claim that the product "lost all of its distinctive characteristics" by being used exactly as intended. In any event, this debate goes not to the definition of goods, but to whether the plaintiffs can establish that the alleged defects "existed at the time of sale" by the manufacturer. *Bly*, 713 F.2d at 1043, n. 2. This contest cannot be resolved on a demurrer.

Nothing in the UCC's definition of goods addresses, much less trumps, the broad reach of Virginia's anti-privity statute.

It seems an obvious *non sequitur* to say, as the defendants do, that (a) because the plaintiffs cannot sue the builder, then (b) they likewise cannot sue the manufacturers and assemblers of the building materials. The conceptual error becomes even clearer by carrying it to its logical conclusion. Consider the situation where no sale of goods occurs or, for that matter, where no sale of anything occurs (either services or goods), as when a plaintiff borrows a lawn mower from a friend. True, the plaintiff cannot sue the friend under implied warranty law when the mower explodes and causes injury. But that truism has no bearing on whether the plaintiff can sue the manufacturer of the lawn mower. He can, of course, by virtue of being a "person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods." Va. Code Ann. § 8.2-318.

The presence or absence of a sale of goods *directly involving the plaintiff* plays no role in the analysis.[4] *Cf. Morgen Industries, Inc. v. Vaughan*, 252 Va. 60, 471 S.E.2d 489 (1996) (employee of purchaser has standing to assert implied warranty claim against non-privity manufacturer); *Lust v. Clark Equipment Co.*, 792 F.2d 436 (4th Cir. 1986). The sole inquiry should be whether the plaintiff fits within the class of persons "whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods." Va. Code Ann. § 8.2-318.

The logical consequences of the defendants' argument go far beyond the circumstances of this case. If a claimant loses his implied warranty claims against upstream defendants because an intervening contract for services took place, then personal injury or death claims (no less than claims for economic

---

[4]  In its briefs in support of the demurrer, Dryvit cites as its lead case *Coakley & Williams v. Shatterproof Glass Corp.*, 706 F.2d 456 (4th Cir. 1983), for the proposition that "implied warranties, applicable to the sales of goods, do not pass to purchasers of services." Dryvit Brief in Support of Demurrer at 3 (April 4, 2001); Dryvit Reply Brief in Support of Demurrer at 2 (June 15, 2001). The Fourth Circuit, however, expressly made no ruling on this issue. *Coakley & Williams*, 706 F.2d at 458, n. 8 ("Upon remand, nothing should prevent Coakley from arguing that Shatterproof [the remote supplier], clearly having supplied goods, remains subject to the U.C.C., regardless of whether Washington [the alleged services provider] might establish a defense on the merits because it could, through full development of the relevant facts and criteria show that the contract of Washington and Coakley was predominantly one to perform services and, hence, not governed by the U.C.C. . . . . However, we emphasize that the proposition raised for the first time on appeal has not figured in our disposition of the case.").

losses) would be barred. For example, if a repairman tuned up the boiler and in the process replaced a piece of the equipment (with the predominant thrust of the transaction still being a services contract), no implied warranty claims could be asserted against the part maker if that same part, because of an inherently defective design, caused the boiler to explode and fatally injure the homeowner who hired the repairman. Likewise, under the defendants' argument, a person killed when a defectively manufactured elevator drops to the bottom of the shaft would have no implied warranty claims against the elevator manufacturer if, as will almost always be the case, the elevator was installed in the building during its construction. These examples cannot be dismissed as an exaggerated parade of horribles. They demonstrate how the position advocated by the defendants would unsettle settled principles of product liability law.

The Court recognizes that its reasoning differs from *Winchester Homes, Inc. v. Hoover Universal, Inc.*, 30 Va. Cir. 22 (Fairfax 1992), which reached a different conclusion. In that case, the court acknowledged that the transaction-in-goods requirement of § 8.2-102 was "not dispositive of the issue." *Id.* at 30. In other words, the UCC itself did not compel the conclusion reached by that court — a telling admission, to be sure. The court also conceded its reasoning was "not self-evident." *Id.* Undeterred by these concessions, the court held that permitting the anti-privity statute to operate in this context would be "against public policy." *Id.* Though citing no authority from other jurisdictions, the court believed that permitting a recovery would upset the uniformity of the "law among the various jurisdictions" and lead to "extraordinary" results unintended by the anti-privity statute. *Id.* The court also stated that it feared "broad" and "dramatic" economic consequences would result if a claimant could, in addition to suing the builder, also bring UCC claims against suppliers of defective building materials. *Id.*

The reasoning of *Winchester Homes* seems to stand on its own shoulders. To begin with, the task of a court interpreting a statute is to apply its plain meaning. Once it became clear (as it did in *Winchester Homes*) that § 8.2-102's transaction-in-goods requirement did not displace the anti-privity statute, that observation should have ended the analysis. Courts have no authority to reengineer legislation on public policy grounds. Even if Virginia's expansive anti-privity statute put it at odds with other jurisdictions, no court has the structural authority to impose national uniformity on an aberrant state law. All the more, a court's fear that legislation will produce economic burdens disproportionate to its statutory benefits (an uncompelling assumption

in this case) does not authorize a judicial upgrade of the allegedly unwise legislative codes on public policy grounds.[5]

For these reasons, the Court holds that the UCC applies to the implied warranty claims by the plaintiffs against Dryvit, MW, and Lowe's. The Court overrules the defendants' demurrer to Counts IX, X, XVI, and XVIII and declines to dismiss these claims on the ground that the builder's services contract and the incorporation of building materials into the building somehow precludes UCC implied warranty claims against upstream manufacturers and assemblers.

In sum, the economic loss rule precludes any negligence and constructive fraud claims by the plaintiffs against Dryvit, MW, and Lowe's, remote suppliers with whom the plaintiffs share no privity of contract. The plaintiffs' implied warranty claims seeking direct damages from these defendants, however, survive scrutiny under the economic loss rule as well as the UCC principle limiting implied warranties to transactions in goods. As homeowners, the plaintiffs easily fit within the class of persons which the defendants "might reasonably have expected to use, consume, or be affected by" the supplies used in the construction of the plaintiffs' home. Va. Code Ann. § 8.2-318. It is so ordered.

---

[5] It seems ironic, therefore, for *Winchester Homes* to grasp this point but apply it in favor of striking down the plaintiffs' rights under the anti-privity statute. *Winchester Homes, Inc.*, 30 Va. Cir. at 33 ("Arguments extending the UCC's applicability should be addressed to the legislature, not to this Court."). The plaintiffs sought no extension of the UCC implied warranties to them; the anti-privity statute had already done that.