I concur in affirming the summary judgment against the plaintiffs on their fraudulent-suppression claims. I respectfully dissent, however, from affirming the summary judgment against the plaintiffs on their AEMLD claim, their implied warranty claim, and their negligent-design claim. I will discuss only their AEMLD claim and their implied warranty claim.
The new definition of product announced by the main opinion in addressing the AEMLD claim effectively abolishes the Alabama Extended Manufacturer's Liability Doctrine (AEMLD) in claims for one class of dangerously defective manufactured building materials or components but not in claims for another class of dangerously defective manufactured building materials or components, without any precedential or policy justification for discriminating between the two classes. This new definition will foreclose AEMLD claims against the manufacturers, suppliers, and sellers of dangerously defective bricks, mortar, concrete, nails, bolts, girders, beams, trusses, laminated trusses, pilings, and other vital structural materials, members, and fasteners, as well as other materials and components that are irretrievably integrated into the structure of buildings. Yet this new definition will accommodate AEMLD claims for dangerously defective components that are more transient and less vital to the safety and happiness of the owners and occupants of the buildings.
In Casrell v. Altec Industries, Inc., 335 So.2d 128, 132-33 (Ala. 1976), this Court, through all nine of its then incumbent Justices, unanimously held:
 "We now extend the doctrine of `manufacturer's liability,' and by definition this doctrine shall include not only the manufacturer, but also the supplier and the seller. We do not intend to impose a no-fault concept. On the other hand, we adhere to the tort concept of fault. Under the `extended manufacturer's liability doctrine,' we opine that a manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law. As Dean Wade [On the Nature of Strict Tort Liability for Products, 44 Miss.L.J. 828 (1973)] suggests, we hold scienter is supplied as a matter of law, and there is no need to prove its existence as a matter of fact. In other words, the fault or negligence of the defendant is that he has conducted himself in a negligent manner by placing a product on the market causing personal injury or property damage, when used to its intended purpose. As long as there is a causal relationship between the defendant's conduct and the defective product, he is held liable because he has created an unreasonable risk of harm. Liability — subject to allowable legal defenses — attaches solely because the defendants have exposed expected users of a product not reasonably safe to unreasonable risks. This is morally and legally correct.
"To establish liability, a plaintiff must show:
 "(1) he suffered injury or damage to himself or his property by one who sells a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if
 "(a) the seller is engaged in the business of selling such a product, and
 "(b) it is expected to and does reach the user or consumer without *Page 13 
 substantial change in the condition in which it is sold.
 "(2) Showing these elements, the plaintiff has proved a prima facie case although
 "(a) the seller has exercised all possible care in the preparation and sale of his product, and
 "(b) the user or consumer has not bought the product from, or entered into any contractual relation with, the seller.
 "By extending the doctrine of manufacturer's liability, we are not invading the province of the Legislature. Developing case law is a proper role for this court, and that is what we are doing in this case. We are here removing the defense of due care in the manufacture and sale of the product. The care with which a defective product is manufactured and sold is now immaterial, when given the allegation and proof of injury resulting proximately from the product's defective condition."
(Footnote omitted.) The Casrell Court did not limit the meaning of the term product to any specialized definition.
In a different but pertinent context, this Court has held:
 "The fundamental rule of statutory construction is to ascertain and give effect to the intent of the legislature in enacting the statute. Words used in a statute must be given their natural, plain, ordinary, and commonly understood meaning, and where the plain language is used a court is bound to interpret that language to mean exactly what it says. If the language of the statute is unambiguous, then there is no room for judicial construction and the clearly expressed intent of the legislature must be given effect. Tuscaloosa County Comm'n v. Deputy Sheriffs' Ass'n of Tuscaloosa County, 589 So.2d 687 (Ala. 1991)."
IMED Corp. v. Systems Eng'g Assocs. Corp., 602 So.2d 344, 346 (Ala. 1992). While the IMED holding emphasizes deference to legislative prerogative, the fundamental premise of the IMED plain-meaning doctrine is that, as a general rule, lawmakers say what they mean and mean what they say. When this Court sets a precedent, as it did in Casrell, this Court makes law, for better or for worse. In performing this function, the Justices of this Court are lawmakers, albeit within the strict confines of § 43, Ala. Const. 1901 (allocating the powers of government among the three branches of state government). In performing this function, the Justices of this Court must be presumed to say what they mean, to mean what they say, and to intend the plain meaning of their words. Any departure from the plain meaning of a term in a precedent is, therefore, a change in the law and, to that extent, a new law. I respectfully submit that this Court should not make a new law that is injurious to the public.
In the absence of precedent defining the term product, its plain meaning would be its dictionary meaning. Webster's Ninth New CollegiateDictionary and Merriam-Webster's Collegiate Dictionary, (10th ed.), both define product as "something produced." Black's Law Dictionary 1209 (6th ed. 1990) defines product as
 "[g]oods produced or manufactured, either by natural means, by hand, or with tools, machinery, chemicals, or the like. Something produced by physical labor or intellectual effort or something produced naturally or as a result of natural process as by generation or growth." (Emphasis added.)
These definitions are entirely consistent with each other. Today's decision redefines the term product to exclude building *Page 14 
materials, members, and components that are irretrievably and permanently incorporated into a house or other building. This redefinition of the term product is a pronounced departure from, and restriction on, the plain, common, ordinary meaning of product as typified by the dictionary definitions.
Our precedent of Wells v. Clowers Constr. Co., 476 So.2d 105 (Ala. 1985), recognized and cited by the main opinion, does not require today's change in the law. In Wells, the third owner of a house asserted his AEMLD claim against only the original builder of the house, and for only the defectiveness of the fireplace originally built into the house. TheWells plaintiff did not, as do the plaintiffs now before us, assert an AEMLD claim against any manufacturer, supplier, or seller of any materials or components. The Wells court held only that "[o]nce affixed to a house, a fireplace becomes as much a part of that house as the four walls, and a house cannot be classified as a `product' for purposes of the AEMLD." 476 So.2d at 106. While Wells excludes houses from the definition of product and thereby protects homebuilders against AEMLD claims for the defectiveness of integral parts of houses, no aspect or policy of Wells militates in favor of extending such protection to the manufacturers, suppliers, or sellers of dangerously defective materials, members, or components integrated into the structure of houses or other buildings. Rather, considerations of public health and safety militate against any such extension of Wells and militate against the change in the plain meaning of product wrought by today's decision.
The integration of building materials, members, and components into the structure of buildings in accordance with the purpose of those materials, members, or components intended by the manufacturers, suppliers, and sellers in no way detracts from the character of those materials, members, or components as products. Rather, the legally significant effect of integrating dangerously defective materials, members, and components into the structure of buildings is to place the dangerousness where it poses the greatest hazard to health and safety. Therefore, the integration of the materials, members, or components into the structure of buildings hardly justifies the effect of today's decision to insulate those manufacturers, suppliers, and sellers from AEMLD responsibility.
Thus, I respectfully submit that, for AEMLD cases, we should defineproduct as anything a manufacturer produces. Manufacturers, and the suppliers and sellers of those products, can hardly complain that such a definition is unfair. With such a definition, the plaintiffs before us would be entitled to a reversal of the summary judgment entered against them on their AEMLD claim.
My reason for dissenting from affirming the summary judgment against the Kecks on their implied warranty claim is that the EIFS system can be considered a "good" as defined by the Uniform Commercial Code, §7-2-105, Ala. Code 1975. The persuasive case of Stoney v. Franklin, 44 UCC Rep. Serv.2d 1211 (Va. Cir.Ct. 2001), analyzing the same applicable Uniform Commercial Code sections that are incorporated in the Alabama Code, explains:
 "[T]he defendants assert that the UCC also does not apply to sales of immovable improvements to real estate. The term `goods' includes things `which are movable at the time of identification to the contract for sale' and can include fixtures to realty if they are intended `to be severed from realty.' Va. Code Ann. § 8.2-105(1) (Michie 1991). The building supplies complained about in the *Page 15 
 motion for judgment were all incorporated into the residential building. They did not at that time
involve movable goods, or for that matter, identifiable goods intended later to be severed from the realty. The building itself constitutes an improvement to realty, a fixture qualifying for the status of real property every bit as much as the land itself.
 "This analysis is certainly right, as far as it goes — but it only goes so far. It proves that the UCC does not apply to the sale of the residence because it constitutes both a services contract and a sale of an improvement to realty. And, for that reason, the plaintiffs cannot sue the builder for breach of any UCC implied warranties. In this case, however, no such claim has been asserted. Instead, the plaintiffs seek to enforce the implied warranties made by the manufacturers and assemblers of the building products. Those transactions clearly involved sales of goods, not contracts for services or real estate. Under Va. Code Ann. § 8.2-105(1), goods exist if they `are movable at the time of identification to the contract of sale.' In context, the `contract of sale' identifying the goods refers to the sale involving the seller that made the implied warranty — not simply the party with whom the claimant contracted.
 "Unless disclaimed, implied warranties accompanying goods extend under Virginia's anti-privity statute to any `person whom the manufacturer or seller might reasonably have expected to use, consume, or be affected by the goods.' Va. Code Ann. § 8.2-318. . . .
". . . .
 "The logical consequences of the defendants' argument go far beyond the circumstances of this case. If a claimant loses his implied warranty claims against upstream defendants because an intervening contract for services took place, then personal injury or death claims (no less than claims for economic losses) would be barred. For example, if a repairman tuned up the boiler and in the process replaced a piece of the equipment (with the predominant thrust of the transaction still being a services contract), no implied warranty claims could be asserted against the part maker if that same part, because of an inherently defective design, caused the boiler to explode and fatally injure the homeowner who hired the repairman. Likewise, under the defendants' argument, a person killed when a defectively manufactured elevator drops to the bottom of the shaft would have no implied warranty claims against the elevator manufacturer if, as will almost always be the case, the elevator was installed in the building during its construction. These examples cannot be dismissed as an exaggerated parade of horribles. They demonstrate how the position advanced by the defendants would unsettle settled principles of product liability law." (Second emphasis added.)
Like the Virginia anti-privity statute (Va. Code Ann. § 8.2-318), § 7-2-318, Ala. Code 1975, eliminates any privity requirement between a seller or manufacturer and a consumer in the consumer's implied warranty action for personal injury. Bishop v. Faroy Sales, 336 So.2d 1340
(Ala. 1976). Mental anguish resulting from damage to a home is a legally recognizable and compensable form of personal injury. Southern EnergyHomes, Inc. v. Washington, 774 So.2d 505 (Ala. 2000). See also F. BeckerAsphaltum Roofing Co. v. Murphy, 224 Ala. 655, 141 So. 630 (1932), andVolkswagen of America, Inc. v. Dillard, 579 So.2d 1301 (Ala. 1991). Therefore, the plaintiffs before us are entitled to a reversal of the summary judgment entered *Page 16 
against them on their implied warranty claim.